### SMITH v. UNITED STATES.
No. 2756.

District Court, D. Maryland.

Aug. 8, 1946.

Sol C. Berenholtz, of Baltimore, Md., for libelant.

Bernard J. Flynn, U. S. Atty., C. Ross McKenrick, Asst. U. S. Atty., and Ober, Williams, Grimes & Stinson, all of Baltimore, Md. (Robert W. Williams and Southgate L. Morison, both of Baltimore, Md., of counsel), for respondent.

CHESNUT, District Judge.

This is a libel in personam against the United States pursuant to the provisions of the Suits in Admiralty Act, 46 U.S.C.A. § 741. The libelant was employed as Chief Mate aboard the Steamship Milton J. Foreman, a Liberty ship owned by the United States and operated for the War Shipping Administration by the International Freighting Corporation as its agent. The ship made its maiden voyage from Savannah, Goorgia, where it had been launched, to Liverpool, England, sailing from Savannah on or about December 4, 1944, and returning to New York on January 8, 1945. At the conclusion of this voyage the libelant, Smith, was found to have a case of "minimal" tuberculosis, for which he was hospitalized at the Maryland State Sanitarium at Sabillasville, Maryland, from February 28, 1945 until his discharge on May 14, 1946, with instructions to report there periodically for examination and with the advice that very probably within one year thereafter his health would be sufficiently restored to enable him to resume his sea-faring occupation.

While at the Sanitarium this suit for damages was filed on November 13, 1945, making· the complaint therein that his illness was proximately caused by the failure of the ship to provide a proper and sufficient "slop chest" in consequence of which he was unable to procure therefrom a pair of rubber boots, with the alleged result that a cold which he had contracted was aggravated and finally developed into tuberculosis due to his getting his feet wet while standing the usual watches on the bridge of the ship in unusually wet and rough weather at sea.

The duty of the ship owner with respect to "slop chests" is provided for in 46 U.S. C.A. § 670, which reads as follows:

"670. Slop chests. Every vessel mentioned in section 666 shall also be provided with a slop chest, which shall contain a complement of clothing for the intended voyage for each seaman employed, including boots or shoes, hats or caps, underclothing and outer clothing, oiled clothing and everything necessary for the wear of a seaman; also a full supply of tobacco and blankets. Any of the contents of the slop chest shall be sold, from time to time, to any or every seaman applying therefor, for his own use, at a profit not exceeding 10 per centum of the reasonable wholesale value of the same at the port at which the voyage commenced. And if any such vessel is not provided before sailing, as herein required, the owner shall be liable to a penalty of not more than $500. The provisions of this section shall not apply to vessels plying between the United States and the Dominion of Canada, Newfoundland, the Bermuda Islands, the Bahama Islands, the West Indies, 'Mexico and Central America. June 26, 1884, c. 121, § 11, 23 Stat. 56."

To maintain his suit for damages the libelant is obliged to show by a preponderance of the evidence (1) that the ship owner failed to comply with the provisions of this statute and (2) that such failure was the proximate cause of the libelant's illness. The complaint, however, as construed by counsel for the libelant, and not disputed by counsel for the respondent, contains elements which as an alternative to damages are sufficient to permit a recovery of the appropriate sum for "maintenance and cure". Hern v. Moran T. & T. Co., 2 Cir., 138 F. 2d. 900, 904; Rey v. Colonial Nav. Co., 2 Cir., 116 F.2d. 580.

From the evidence in the case submitted in open court by the principal witnesses, I find the following material facts:

1. In October 1944 the libelant was employed at Baltimore, Maryland, as Chief

Mate of the SS Foreman with base wages of $254 per month plus certain bonuses and overtime together with the value of his quarters and food aboard the ship which latter two items were to be valued at $6.00 per day. He proceeded with Captain Keith from Baltimore to Savannah, Georgia, and remained with Keith at a hotel for some days before he, Smith, took up his quarters on the ship. It was noticed by Captain Keith that Smith then had a bad and troublesome cough which he said was due to sinus trouble; but he passed a sufficient physical examination for service and apparently was not then suffering from tuberculosis and had had no serious prior illness.

2. The vessel sailed from Savannah on November 15, 1944, and almost immediately ran into a storm and heavy wet weather. Almost at once Smith developed a cold which continued to grow worse during the voyage. He had brought his usual gear, that is clothing, with him on board as was customary with seamen, with the exception of a pair of rubber boots which he had discarded from his last voyage because they were worn out or badly damaged. A day or two after the ship sailed he went to the "slop chest" with the Purser, who was in charge of it, in an endeavor to procure another pair of boots but was unable to find in the assortment of twelve pairs a pair which would fit him. The libelant is a large man six feet four inches tall and naturally has a large foot. He weighs about 200 pounds. He accordingly stood his usual watches on the bridge with ordinary shoes and now contends that by reason of getting his feet wet his cold was aggravated and subsequently developed into and was diagnosed as minimal·tuberculosis. He made no complaint to the Captain of the ship with respect to his inability to obtain rubber boots. He was unable to buy a pair of rubber boots in Liverpool but on the return voyage he did obtain a pair from the Naval Gunnery Officer of the ship.

3. With respect to the "slop chest", the War Shipping Administration under date of October 7, 1942, published Operations Regulations No. 13. It stated that the General Agents of the War Shipping Administration "shall provide a slop chest for the benefit of seamen aboard each vessel as soon as it enters service. The Master shall submit to the General Agent a requisition for the items required for the general voyage and the General Agent shall purchase same for account of the War Shipping Administration. * * * The General Agent shall supply the Master with cost prices of each item and the Master shall sell, from time to time, as specified by him, any of the contents of the slop chests to any and every seaman applying therefor." In accordance with the statute the retail sale price to seamen should not exceed 110% of reasonable wholesale value. The general agents were directed not to place insurance on the contents of the slop chest as the War Shipping Administration assumed all risks, marine and war, thereon. The Regulation concluded:

"It shall be the responsibility of each General Agent and Master to exercise reasonable care and diligence in the compliance with the owners obligations herein and in protection and disposition of the contents of the slop chests."

4. The customary routine with respect to providing the slop chest was followed in this case. Under date of October 18, 1944, an itemized list of items for the slop chest was prepared which consisted of 60 different items or classes of articles with the number of each item specified. It included such items as boots, caps, coats, drawers, gloves, handkerchiefs, pants, shirts, socks, razor blades, brushes, cigars, pipes, tobacco, chewing gum and playing cards, etc. Among the items called for were 12 pairs of boots, rubber, hip. This order or requisition was signed by the libelant O. K. Smith and approved by the master, Darrell E. Keith, and also approved by the operating manager, W. W. Jordan. It is to be noted that the size of the several items of wearing apparel were not specified but only the quantity or number of units of each item. There is no requirement in the Regulation that sizes shall be specified and there is no evidence in the case that the master or others acting for the ship were expected or required to specify size of wearing apparel or that it has ever been customary to do so.

5. In due course the requisition for the slop chest was submitted by the general agent, the International Freighting Corpo-

ration, to the Seven Seas Supply Company of New York City, by purchase order No. 5221. In due course it filled the order and shipped the merchandise to the SS Foreman at Savannah, where it was duly received, including the item of 12 pairs of rubber boots. The witness, Maurice Muney, whose deposition was taken in New York, the manager for the supplier, testified that he personally supervised the filling of the order and that it was customary where no specific sizes of articles such as rubber boots were specified in the order to supply an assortment which, in this case consisted of two 7's; three 8's; three 9's; two 10's and two 11's. The evidence does not show that in checking the quantities of goods received by the ship any record was made of the particular sizes of articles received. The libelant testified that in company with the Purser he was unable to find among the rubber boots a pair that would fit him or that he could wear. It does not appear that he then made any special note or record of the size of the boots included, but he said that he ordinarily wore a size 11, but could wear a 10. The inference from his testimony would be that there were no size 10 or 11 among the twelve pairs of boots included. It seems impossible to reconcile the statement of the two witnesses except on the possibility that an inadvertent mistake may have been made in the size in supplying the order; or that the libelant in fact required a size larger than 11.

6. The libelant failed in a marked degree to exercise reasonable care and diligence in the matter of procuring boots for his use.

7. The respondent substantially complied with the statutory requirement for a "slop chest".

8. There was testimony submitted by the libelant tending to show that his light case of tuberculosis was caused in part or possibly aggravated by wet feet while on duty either on the bridge or in the hold; but weighing the evidence as a whole I do not find as a fact that the failure of the libelant to obtain a pair of rubber boots from the slop chest that would fit him was the proximate cause of his tuberculosis. The evidence in this respect will be more fully discussed hereafter.

My conclusion of law from the evidence as a whole is that the libelant has failed to establish a legal claim for damages against the ship owner but is entitled to receive an award for maintenance and cure in the amount of $1980.

The libelant's claim for damages is predicated on an alleged failure of the ship owner to comply with the statutory provision for a slop chest. The evidence is not very full or satisfactory with respect to the nature and purposes of and customary practice regarding the composition of the slop chest; but from such evidence as there is in the case regarding it, I find there was a substantial compliance with the statutory requirement.

The statute is now codified as section 670 of title 46 U.S.C.A. It derives from the Act of June 26, 1884, c. 121, 23 Stat. 56, which is entitled "An Act to remove certain burdens on the American merchant marine and encourage the American foreign carrying trade and for other purposes." It was in the nature of an amendment or addition to the original Act of June 7, 1872, 17 Stat. 262, c. 322, entitled "An Act to authorize the Appointment of Shipping-commissioners by the several Circuit Courts of the United States, to superintend the Shipping and Discharge of Seamen engaged in Merchant Ships belonging to the United States, and for the further Protection of Seamen". That original Act was a lengthy one providing for the appointment of shipping commissioners and making many detailed provisions with regard to the employment and discharge of seamen and their wages. Although the particular statute respecting the slop chest has been in force for more than sixty years, it seems there have been no judicial decisions under it other than a few relating to the matter of prices charged seamen for articles purchased.

The complaint in the case does not specify whether the respondent's alleged liability is based on the Jones Act, 46 U.S.C.A. § 688, or under the general admiralty law; but counsel for the libelant argues that there is liability under either or both. Thus he says that the respondent is liable under the Jones Act by reason of its negligent failure to provide an adequate slop chest

and also liable under the admiralty law because by reason of an inadequate slop chest the ship must be considered to have been unseaworthy.

With respect to the Jones Act as a basis of liability it is further contended that the slop chest statute is in the nature of a safety statute within the meaning of 45 U.S.C. A. § 53, Federal Employers Liability Act, which provides that contributory negligence of the employe—"shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee." It thus becomes important to the libelant to have the slop chest statute classified as a safety statute in order to avoid the consequences of his own contributory negligence or lack of reasonable care and diligence in the procurement of the rubber boots. It is also pointed out that if it is a safety statute the failure to comply with it constitutes negligence as a matter of law. Texas & P. R. Co. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874: Spokane & Inland Co. v. Campbell, 241 U.S. 497, 36 S.Ct. 683, 60 L.Ed. 1125.

It is doubtful that the slop chest statute should be classified as a safety statute within the meaning of section 53. No direct authority is cited for the proposition. But reference is made to the decision of the Supreme Court of the State of Washington, Rooker v. Alaska S. S. Co., 185 Wash. 71, 33 P.2d 295, certiorari denied 299 U.S. 552, 57 S.Ct. 14, 81 L.Ed. 406, holding that section 669 of title 46 should be so classed. That section provides that vessels bound on certain foreign voyages must provide a safe and warm room for the use of the seamen in cold weather. There are differences between the nature and purposes of sections 669 and 670 respectively. There would seem to be much more reason for holding a requirement of a warm room a safety statute than in the case of a slop chest. But however that may be, for the reasons herein stated the respondent is not liable for the damages whether or not the slop chest statute is regarded as a safety statute.

Counsel for the libelant argues that the slop chest statute must be given not only a very liberal construction in the interest of the seamen, but a very meticulously literal application. On the contrary, it is my opinion that the nature of the case requires a reasonable application of the statute. It seems clear enough that the contents of the slop chest are intended primarily for the convenience of the seamen and for replacement in emergency situations of articles of clothing. By the long established custom seamen are expected to and do provide their own gear or clothing when they engage upon a ship. It seems obvious that it could not reasonably have been intended by Congress that merchant ships with their limited space other than for cargo, would be required to carry a large assortment of articles of clothing, sufficient at all times to supply any and every seaman with any and all articles of clothing which he might desire to purchase in every size suitable for any and every member of a crew of possibly fifty men. There is no evidence that such a construction of the Act has heretofore been in accordance with the common understanding and customary practice regarding the slop chest. On the contrary, so far as the evidence disclosed, it has been the customary practice for the master of the ship in making up his requisition for the slop chest to include only such articles and quantities thereof as may seem to be reasonably necessary on the basis of prior experience. The statute applies only to ships "bound from a port in the United States to another foreign port, or being of a burden of 75 tons or upward, and bound from a port on the Atlantic to a port on the Pacific, or vice versa." See section 666 (referred to in section 670) relating to a "medicine chest". There is no evidence as to the origin of the term "slop chest"; but the very name would tend to indicate that it was intended to include miscellaneous articles for the convenience of seamen or as a surplus store for only emergency use. The limitation as to wholesale prices would also seem to indicate that it was for the benefit of seamen with respect to cost of articles. And, as above noted, the regulations pro-

vide for the exercise of only "reasonable care and diligence in the compliance with the owner's obligations."

With respect to the composition of the slop chest, the statute is general rather than specific. Counsel for the libelant emphasizes the phrase that the slop chest "shall contain a complement of clothing for the intended voyage for *each* seaman employed, * * * and everything necessary for the wear of a seaman". But it will also be noticed that in specifying what shall be included the phrase is "including boots *or* shoes, hats *or* caps, underclothing and outer clothing, oiled clothing," etc. It may be doubted whether the wording makes an absolute requirement that boots must inexorably and absolutely be always included in the slop chest. But this is really not important because it seems to have been the customary practice to include in the requisition a reasonable number of pairs of rubber boots and in the instant case the number actually ordered and received was 12 pairs; and the evidence further shows that at the end of the voyage only one pair of rubber boots had been sold and it was not thought necessary by the master or purser acting for him, to order the replacement of this one pair for the next voyage.

The evidence does not show that the libelant himself, an experienced seaman, acting as Chief Mate of the ship, and signing the requisition for the slop chest in this case, had the understanding of the statute now urged by his counsel. He said that he knew he should have a pair of rubber boots for the voyage and that the pair he had had on the last voyage had been discarded and that he expected to buy another pair from the slop chest on this voyage. He knew also that he required a very large size for his comfort and convenience; but in signing the requisition he made no specification of any particular sizes. When his attention was called to the fact that he had signed the requisition without specifying sizes, he said that he thought his signature was merely a receipt for the articles rather than an original requisition. But even if so, he made no inquiry whether a suitable size of boots for his use was included among the twelve pairs of boots that were received from the supplier. And although he remained in the port of Savannah for several weeks before the ship sailed he made no effort to purchase a suitable size of boots on shore before sailing.

The contention of his counsel now is that there was an absolute obligation on the ship to have available in the slop chest a pair of rubber boots which would fit any and every member of the crew of fifty which, if literally applied, would have required an inventory for the slop chest very much larger than the requisition made or approved by the libelant himself. If there was any such duty incumbent on the ship it would seem that the libelant himself failed in his duty as Chief Mate to comply with the statute. I refer to this in this connection not so much as contributory negligence of the libelant but rather as evidence of his own understanding of the proper application of the statutory provision in accordance with the customary practice.

Furthermore it is hard to reconcile the conflicting testimony in the case as to the sizes of the assortment of twelve pairs of rubber boots. I do not doubt the sincerity of the libelant in saying that he did not find a pair in the whole assortment that fit him, or, as he expressed it, that he could wear; but there is inherently something of a subjective element in rejecting as unsuitable a pair of boots or shoes offered by a salesman. Then again it is entirely possible that there may be variation of comfortable fit of even the same size of boots made by different manufacturers. The credibility of both the libelant and the manager for the supply house in this case would seem to be equal; the plaintiff is, of course, an interested witness and his whole case depends upon establishing a breach of the slop chest statute. For this reason it requires careful consideration of his evidence, affected by the subjective nature of the subject matter and weighing his statement that he could not wear any of the twelve pairs of boots in the slop chest, against the testimony of the supplier that two pairs of No. 10's and two pairs of No. 11's were included in the assortment. Perhaps it may be said that the supplier was himself to some extent an interested witness to avoid a possible charge of negligence on his part in filling the order and it is also not

to be overlooked that the latter was testifying to a rather routine matter occurring nearly two years in the past. But however that may be, upon consideration of all the evidence, I am of the opinion that there was a reasonable and substantial compliance in this case with the slop chest requirement even if it should be determined as a fact on the conflicting evidence that the assortment of boots did not include a size 10 or 11.

■ There is another insufficiency in the libelant's proofs. I am unable to find convincing evidence that the failure of the libelant to have and wear rubber boots on a part of the voyage was a proximate cause of the libelant's tuberculosis. On this point the libelant submitted the testimony of Dr. Victor Cullen, Superintendent of the Maryland State Tuberculosis Sanitarium, where the libelant was treated for about a year. He expressed the opinion that from his original examination of the libelant in February 1945 it was likely, though uncertain, that the tubercular condition was of recent origin and he said that from the history of the case as given to him by the libelant, his condition might have been caused by his exposure on the ship's bridge during wet and rough weather without wearing rubber boots. But on careful consideration of Dr. Cullen's evidence as a whole it is apparent that his opinion was a matter of much uncertainty. When first questioned his answer was that it was *possible*. Under more pointed questions he said he thought it was *reasonably probable*.

While I have carefully considered Dr. Cullen's whole testimony, there are numerous other factors which must be considered in reaching a judicial determination as to whether the assigned cause was the real and effective or proximate cause.

There was no positive testimony in the case just when the libelant's tubercular condition actually developed. The evidence shows that prior to the beginning of the particular voyage the libelant was suffering from a bad morning cough which he attributed to a chronic sinus condition. He was also suffering from and being treated for indigestion. The voyage was a very wet and rough one and his exposure on the

bridge for his watches was a necessary requirement of his service, which, in a rough wet voyage in the North Atlantic in winter under wartime conditions naturally tended to lower his vitality or resistance. He developed a cold almost immediately at the beginning of the voyage. Nothing has baffled medical science more than the origin of a common cold and the proximate cause of tuberculosis is also very uncertain. It is said that a large percentage, possibly eighty per cent. of all people carry in their lungs the potentiality of tuberculosis which may be lighted up by any one of many causes when there is lowered resistance or vitality. It is also perhaps within the range of ordinary medical knowledge that merely having wet feet while a person is active and the blood circulation good, is not of itself necessarily a cause of cold or lowered vitality which comes rather only when after activity the feet are allowed to remain wet with a resulting chilling effect. The libelant had at least two pairs of ordinary shoes, presumably had woolen socks, and opportunities to change his wet shoes and socks with the cessation of each watch on the bridge.

In a somewhat similar case, Hern v. Moran T. & T. Co., 2 Cir., 138 F.2d 900, 902, Circuit Judge Chase observed—

"The uncontradicted evidence was that pneumonia germs are apt to be present in the normal mouth and throat and that exposure to cold and dampness is a common cause of the lowering of body resistance to the point where the germs will overcome it and a person so exposed will develop pneumonia. It was also undisputed that such exposure when experienced by a person when the power of resistance is at a 'low ebb,' as when a person is asleep, is more apt to result in pneumonia than when it happens to one while 'moving about and active.' "

This case is factually quite different from the one strongly relied upon by counsel for the libelant, Rooker v. Alaska SS Co., supra, where the plaintiff sued the ship owner for damages consequent upon developing tuberculosis due to sleeping in a wet bunk caused by a defective steam radiator where the defendant's negligence was based on failure to provide a warm room as required

by 46 U.S.C.A. § 669. In that case it was held by the Washington Court the question of proximate cause was for the jury. And so in this case, if it had been tried by a jury under the Jones Act, I would say there was evidence legally sufficient to be considered by the jury as to the proximate cause of the libelant's sickness. See also discussion in somewhat similar cases of Hern v. Moran T. & T. Co. supra, and Rey v. Colonial Nav. Co., 2 Cir., 116 F.2d 580. But in the instant case the judge without a jury has to weigh the evidence and I am unable to find, looking at the factual situation as a whole, that the libelant has convincingly shown that his tuberculosis was proximately caused by getting wet feet due to not having rubber boots, or that the absence of the latter was a material contributory cause to his condition.

In determining whether the alleged cause was the proximate cause of an injury it is necessary for the libelant to show the existence of more than a mere possibility or strong likelihood. Miller v. Lykes Bros., 5 Cir., 98 F.2d 185, 186; Cadle v. United States, D.C., 65 F.Supp. 288; Willey v. Alaska Packers Ass'n, 9 Cir., 18 F.2d 8.

The libelant now attributes his illness to the absence of rubber boots. It seems to me that this is rather an afterthought on his part. I am satisfied that he attributed no such possible injury to the absence of rubber boots at the time. He made no complaint to the Captain of his inability to purchase suitable boots from the slop chest, and he made no request upon the Captain to endeavor to otherwise procure rubber boots for him. If he had done so it is quite possible the Captain at once would have succeeded in doing what the libelant himself later in the voyage did do, that is, obtain a suitable pair of boots from the equipment supply in charge of the Naval Gunnery Officer on the ship. Shortly after the conclusion of the voyage and after a preliminary diagnosis of the libelant's condition, he for a long time made no complaint to the ship owner of alleged negligence in the equipment of the slop chest. He did write asking for aid in obtaining disability allowance; and did not mention the matter of the rubber boots. If the libel-

ant had during the voyage attributed the importance now assigned to the absence of rubber boots, there are measures that he could have taken to avoid effects of their absence. There was provided on the ship a rubber or waterproof coverall suit for each seaman, the primary use for which was to protect the seaman in the water or in open boats if the ship had to be abandoned in war time. The regulations of official advice with regard to the use of these suits did not prohibit their emergency use on the ship. The libelant had such a suit available for himself and could permissibly have used it as a complete protection against wet feet. He says he did not use it because it was not customary to do so and he evidently thought it would be inappropriate for him to do so. Again I refer to this not in connection with contributory negligence on his part but as an indication that he at the time attributed little importance to the absence of rubber boots.

If the slop chest statute is not to be classed as a safety statute, the respondent has a further substantial defense to all or a very large part of the damages claimed by the libelant arising from the latter's own failure to exercise reasonable care and diligence in an effort to obtain a pair of rubber boots before or on the voyage. The facts in this connection have heretofore been stated. They may be summarized as follows: The libelant failed (a) to procure his own boots before joining the vessel and (b) to include in the requisition for slop chest supplies an order for boots to fit his own feet; (c) to wear the rubber coverall as supplied by the master and (d) to report his need to the master and demand assistance.

Whether the alleged liability is based on the Jones Act or on unseaworthiness of the ship, the libelant's contributory negligence was at least a defense which would have greatly diminished the damages if recoverable. The Arizona v. Anelich, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075; Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265; Roebling Sons Co. v. Erickson, 2 Cir., 261 F. 986; Cricket S. S. Co. v. Parry, 2 Cir., 263 F. 523; 45 U.S. C.A. § 53.

■ It is not necessary to the decision in this case to determine whether the slop chest provision is a safety statute within the purview of 45 U.S.C.A. § 53; but as the question has been argued by counsel I will say that after consideration I think the better view is that it is not such a safety statute. In an historical note appended to section 1, title 45 U.S.C.A. there is a list of the Acts which are commonly referred to as Safety Appliance Acts. They are in connection with railroad equipment and appliances. It may possibly be thought that similar Acts affecting ships and seamen could be considered of the same nature when suit is brought under the Jones Act and based on the Federal Employers Liability Act. But, as already observed, there are differences in origin as well as in subject matter between the "warm room" statute, 45 U.S.C.A. § 669, and the slop chest statute, 46 U.S.C.A § 670. The former, as originally written, is contained in chapter 5 (headed Protection and Relief) of title 53 of the Revised Statutes. It was amended in 1898, 30 Stat. 759, 764. By contrast the slop chest statute was enacted as section 11 of the Act of June 26, 1884, which constituted a general amending and revising of the Shipping Commissioners Act of 1872. (See Inter Island Steam Nav. Ltd. v. Byrne, 239 U.S. 459, 36 S.Ct. 132, 60 L. Ed. 382). The Shipping Commissioners Act contains many details of the terms of contract to be entered into between the ship and seamen. It sets forth the form of contract now codified in 46 U.S.C.A. § 713. This contains the following provision: "And it is also agreed that if any member of the crew considers himself to be aggrieved by any breach of the agreement or otherwise, he shall represent the same to the master or officer in charge of the vessel, in a quiet and orderly manner, who shall thereupon take such steps as the case may require." This provision seems particularly apposite to the facts in this case. The libelant made no complaint to the Captain as to the inadequacy of the slop chest and his inability to obtain a pair of rubber boots therefrom. If he had done so it is probable the Captain could promptly have procured for him the loan of a pair of boots from some other member of the crew or from the Naval Gunnery Officer from whom the libelant himself on the return voyage did succeed in obtaining a pair of boots. This would have been a natural and common sense action for the libelant to take if he had then attributed particular importance to the absence of boots while in service on the bridge or in the hold. As the Captain had the ultimate responsibility for the adequacy of the ship, any complaint as to its inadequacy should promptly have been made to him. The failure of the libelant to take this ordinary and sensible course constituted in a marked degree failure to exercise ordinary care and diligence in the matter to prevent the injury of which he now complains. In a number of cases it has been held that before seamen are justified in deserting, complaint must be made to the master to remedy the alleged unsatisfactory conditions on shipboard. The A. M. Baxter, D.C., 93 F. 479; The C. F. Sargent, D.C., 95 F. 179; Hamilton v. United States, 4 Cir., 268 F. 15.

Therefore, even if we could find negligence of the respondent in this case or unseaworthiness with respect to the slop chest as the proximate cause of the libelant's injuries, the damages to which he would be entitled would necessarily be diminished in proportion to the amount of negligence attributable to him, which, in this case would, I think, be a very great proportion of the whole.

■ I will add a word with respect to the libelant's contention that the ship was unseaworthy by reason of an inadequate slop chest. A ship may be unseaworthy by reason of not having proper appliances and equipment but it seems an extreme and unwarranted extension of the rule to say that the failure to have in the slop chest a pair of rubber boots sufficient in size to fit the libelant made the ship in this case unseaworthy. However, it is unnecessary to pursue the discussion of this point in view of the other findings in the case.

■ I conclude, therefore, that the libelant is not entitled to recover damages for the alleged breach of duty by the respondent. However, he is, I think, very properly entitled to maintenance and cure. The amount of this as agreed upon by coun-

sel on both sides is $1980 at least; but the libelant also contends that he is entitled to the wages that he would have received for the ensuing voyage for which he had signed articles. The exact amount of this is not stated but would probably have amounted to several hundred dollars. I do not think this can properly be allowed under the circumstances. It appears that while the libelant was willing to continue on the ship for a second voyage it was a condition precedent to his acceptance that he pass a satisfactory physical examination. Before signing the articles he had this examination which included the taking of X-ray pictures of his chest. In the interval of time required for their development he signed articles for the succeeding voyage; but before it had begun the developed X-ray plates indicated a probable tubercular condition and he was not accepted as in satisfactory physical condition for the second voyage. It appears, therefore, there was a condition precedent with which he was unable to comply. Counsel have not submitted any authority to show that in such circumstances the libelant was entitled to the wages he would have made on the second voyage as part of allowance for maintenance and cure.

In due course counsel may submit the appropriate order.