## STOKES v. UNITED STATES.

District Court, S. D. New York,
Jan. 20, 1944.

Simone N. Gazan, of New York City, for libelant.

James B. M. McNally, U. S. Atty., of New York City (Tompkins, Boal & Tompkins, and Arthur M. Boal, all of New York City, of counsel), for respondent.

LEIBELL, District Judge.

The libelant was the chief engineer on the S. S. "Henry Bacon," a new ship, which left New York the end of December 1942 on a long voyage, which included a transit of the Panama Canal. Electric current for lighting, refrigeration and other purposes was supplied by three generators, only two of which were operated at the same time. They are located on a mezzanine platform about 8 feet above the floor of the engine room and were known as the inboard, middle and outboard (No. 2) generators. Circuit breakers on the switchboard, like fuses, would automatically kick out, when an unusual load was suddenly put upon the electrical appliances.

Each generator was operated by its own steam engine vertically set up, with a weighted flywheel on the side. The flywheel was weighted to smooth out the action of the engine, by steadying the rotational speed. Attached to the flywheel and moving with it was a governor so connected and held in place by a spring, that if the engine speeded up excessively the governor arm would tend to lag and shut off part of the steam coming to the engine cylinder through the intake valve.

When the electric circuit is complete, there is resistance which the electrical load creates; when the circuit is broken the resistance does not exist. If the electrical load is suddenly taken off the generator,

through the circuit breakers kicking out, the engine will ordinarily increase its revolutions about 10% for a second or two, until the governor brings the speed down to about 2½% of the number of revolutions at which the generator is designed to operate with a load. The flywheel and its governor are covered with a tin casing for the protection of the personnel.

On the trip to the Canal Zone the outboard generator had twice speeded up slightly above normal, when the load was suddenly taken off. This condition was reported to libelant, as chief engineer. He gave directions to try to correct it by an adjustment of the rheostats, but he did nothing to examine the flywheel governor although it was suggested to him as a possible source of the trouble.

On January 18th the vessel was at Balboa preparing to sail. Libelant left the engine room about 4:30 A. M. About 5:30 A. M., while the First assistant engineer was on watch in the engine room and libelant was sitting in the room next to his office on the deck above, the circuit breakers kicked out, all lights on the vessel went out and the outboard generator (No. 2) started to race at an excessive speed. The First assistant engineer (Mr. Marsters) hurried up the steps from the engine room to the mezzanine platform and tried to fix the circuit breakers but was not successful. He then went to the outboard generator and started to turn the valve to cut off the steam.

The libelant realized that there was something wrong in the engine room. The lights had gone out, came on again momentarily but went out again. He left his room and started down to the engine room. When halfway down he heard the heavy vibrations of an engine and knew that one of the engines was running away. He hurried down the rest of the way, using his flashlight. When he entered the engine room, the emergency lights were on and two lights at the switchboard. He saw the First assistant engineer standing near the flywheel of the outboard generator, reaching across it to the valves. Libelant reached a point between the outboard generator and the ship's side when the flywheel disintegrated and its pieces were hurled in all directions. The flywheel fractured because it had attained a bursting speed. It reached this speed because the governor failed to function.

Libelant and the First assistant were struck by pieces of the flying metal. Mar-

sters had both arms broken and pieces of the metal penetrated several parts of his body. Libelant was thrown against the switchboard and his right leg was broken a few inches above the ankle by the flying metal. Both the tibia and fibula of his right leg were broken. He also sustained bruises and a scalp wound.

Parts of the broken flywheel struck the middle generator, smashed valves off the steam pipes and did other damage. Steam started escaping from the broken pipes. An oiler and a fireman managed to carry out libelant's orders—to shut down the main service pump (which cut the fires from under the boilers) and to close the main stop valves and the main auxiliary stop valves.

Libelant and Marsters were removed to the hospital at Balboa where libelant was confined for over two months. He left Balboa about April 8th by plane and arrived in Philadelphia April 9th. He went to the Marine Hospital at Philadelphia and turned over to them the Balboa hospital records. They refused to admit him as a bed patient. At the end of four weeks they X-rayed his leg and told him that it showed no signs of growth of bone—there was no union of the broken parts. They recommended that libelant go to Marine Hospital at Baltimore, for hospitalization.

He first met his attorney in Philadelphia, after the cast was taken off his leg, late in April or early in May. On his attorney's recommendation libelant decided to consult Dr. Nelson W. Cornell an orthopedic specialist in New York City. There he was examined by Dr. Cornell and X-rayed May 11, 1943. Dr. Cornell performed a bone grafting operation May 15, 1943. He took part of the tibia bone from libelant's left leg and grafted it to one side of the broken tibia in the right leg, connecting it with stainless steel screws. A few days later Stokes developed a fever. Apparently some infection followed the operation on the right leg.

On August 10, 1943, Stokes was permitted to leave the hospital but he received further treatment at Dr. Cornell's office. The wound in the right leg did not heal; it continued to discharge and the bone graft showed signs of loosening. On September 27th Stokes was readmitted to the hospital and on the 29th another operation was performed removing the bone graft from the right tibia, which was infected. Stokes was in the New York Hospital from May 12 to August 10, 1943, and from September

58

27th to the date of the trial, January 6, 1944. In all he has had three operations and has been 274 days in hospitals.

At the time of the trial, January 6, 1944, the wound on his right leg was clearing up. He had an arrested case of osteomyilitis. He will never have a firm union of the bones of the right leg. He cannot bear his weight on it. A supporting brace and a cane or crutch will help him get about haltingly. The alternative is amputation and an artificial leg from some point below the knee. Libelant is permanently disabled and barred from following his trade as a marine engineer.

■ The libel as originally drawn pleaded a claim under the Jones Act, 46 U.S.C.A. § 688. Prior to the trial notice was served that the libel would be amended to plead liability under the admiralty or maritime law, on the ground that respondent's vessel was unseaworthy—that the generator was defective—that the governor failed to work properly which resulted in the generator engine speeding up so excessively that the flywheel flew apart and injured libelant. The right to recover indemnity, where the injuries are caused by unseaworthiness of the vessel, is absolute.

■ The following quotations from the opinion of Judge A. N. Hand in The H. A. Scandrett, 2 Cir., 87 F.2d 708, 710, are directly in point:

"This is not an action under the Jones Act (41 Stat. 988) founded on negligence. The libelant is invoking a remedy based on unseaworthiness or defective condition of the vessel or her equipment. In such a case the liability for any injuries arising out of the neglect to supply a seaworthy vessel is not dependent on the exercise of reasonable care but is absolute. * * *

"In our opinion the libelant had a right of indemnity for injuries arising from an unseaworthy ship even though there was no means of anticipating trouble.

"The ship is not freed from liability by mere due diligence to render her seaworthy as may be the case under the Harter Act (46 U.S.C.A. §§ 190–195) where loss results from faults in navigation, but under the maritime law there is an absolute obligation to provide a seaworthy vessel and, in default thereof, liability follows for any injuries caused by breach of the obligation. Nor does this seem an unduly harsh imposition. A ship is an instrumentality full of internal hazards aggravated, if not created,

by the uses to which she is put. It seems to us that everything is to be said for holding her absolutely liable to her crew for injuries arising from defects in her hull and equipment. The liability can be covered by insurance and is better treated as an expense of the business than one left to an uncertain determination of courts in actions to recover for negligence."

Respondent argues that libelant was guilty of negligence in failing to examine the governor and that if he had done so he would have been able to adjust or correct the defect therein. Again a quotation from Judge A. N. Hand's opinion in the Scandrett case covers the facts of this case:

"The contention that the libelant's failure to inspect was the proximate cause of the injury is without basis. At best he may be said to have been guilty of contributory negligence and the jury so found and mitigated the damages he had suffered, as may be done under the maritime law. The Arizona v. Anelich, 298 U.S. 110, 122, 56 S.Ct. 707, 711, 80 L.Ed. 1075."

■ I have made findings herein that the governor on the flywheel of the engine of the outboard generator was defective and unseaworthy. The failure of libelant to inspect the governor was negligence on his part which contributed to the accident. Under the doctrine of comparative negligence in admiralty cases "contributory negligence (of the seaman), however gross, is not a bar to recovery but only mitigates damages." Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424 at page 431, 59 S.Ct. 262, at page 266, 83 L.Ed. 265; The Arizona supra. I have accordingly mitigated or reduced his damages by 30%. Concerning the items of damage I made the following findings:

"29. The libelant would have earned from January 18th to August 24, 1943, if he had completed the voyage, $2,625.00 in salary plus $2,225.00 on bonus, or $4,850.00. On that sum $900.00 has been paid, leaving $3,950.00 as wages and bonus to the end of the voyage (August 24, 1943), which libelant has lost by reason of his injuries. His hospitalization in marine hospitals plus his allowance for maintenance—already received—would take care of any claim for room and board for this period.

"30. A. At the time of the accident the libelant was 60 years of age and he was earning base wages of $4,500.00 per year, plus a 100% bonus. In the year of August 24, 1943 to August 24, 1944 libelant

would have earned in wages and bonus $9,000.00.

"B. He had reasonable prospects of earning wages of $2,700.00 plus his room and board, worth $1,200.00 additional, or a total of $3,900.00 as a First assistant marine engineer for each of the three years, from August 24, 1944 to August 24, 1947, or a total of $11,700.00 for that period. To avoid duplication there must be deducted from this sum of $11,700.00, against the item of room and board included therein, $645.00 which is included in the allowance for maintenance which I am making under the second cause of action.

"C. In August 1947 libelant will be 65 years old. I believe that if in good physical condition he would then have an earning capacity of $2,200.00 a year, as a Second assistant engineer, plus $750.00 a year, the value of his room and board, or a yearly sum of $2,950.00 for the two years of August 1947 to August 1949—a total of $5,900.00 for that period.

"D. Thereafter his usefulness as a marine engineer would be at en end, but he would, if good health, have an earning capacity of about $100.00 a month ashore for a further period of three years, until August 1952—an additional sum of $3,600.00."

On the question of the loss of earning capacity, see the recent case of Carroll v. United States, 2 Cir., 133 F.2d 690.

Respondent argues that libelant is not entitled to his New York Hospital expenses or to any expense for Dr. Cornell's services because in May 1943, while he was being treated as an out patient at the Marine Hospital at Philadelphia, he was offered further hospitalization at the Marine Hospital in Baltimore. He declined that offer and instead went to a private physician Dr. Cornell, who performed the operations on libelant hereinabove mentioned.

■ Libelant had been a patient at the Marine Hospital at Balboa for 81 days and his treatment had not produced any union of the broken parts of the bones. But there was no infection in his leg. The Marine Hospital at Baltimore or the Marine Hospital at Staten Island, New York, were equipped and properly staffed for bone grafting operations. Of course, he was anxious to obtain a firm union of the broken bones so that he could bear his weight on his right leg and have the full use of both his legs. That was essential if he was to continue as a marine engineer. But that anxiety is not sufficient excuse to entitle libelant to charge the respondent with the expense of the operations and hospital care at the New York Hospital. The cases uniformly hold that if the seaman "has declined hospital treatment calculated to improve his condition" he cannot recover those expenses from the ship. The Saguache, 2 Cir., 112 F.2d 482; Calmar S. S. Corp. v. Taylor, 303 U.S. 525, at page 531, 58 S.Ct. 651, at page 654, 82 L.Ed. 993, and the oft-cited opinion of Judge Hough in The Bouker No. 2, 2 Cir., 241 F. 831, at page 835.

I am of the opinion that the libelant was guilty of contributory negligence in that he did not have the governor of the outboard generator examined, although he was informed on at least two occasions that the engine of the generator speeded up when the load of the electric current was suddenly taken off. Libelant thought this could be corrected by an adjustment of the rheostats alone and he expressly rejected the suggestion that the governor should be examined and adjusted. He should have done both, especially when the speeding up was reported to him a second time. His negligence contributed to the accident. I believe that if his damages are mitigated 30% he will be charged for his share of responsibility for the accident.

■ On the second cause of action pleaded in the libel an allowance for maintenance of $1,800, $5 a day for the period from January 6, 1944, to December 31, 1944, is proper. Judge Knox of this Court by an order entered August 25, 1943, while this suit was pending directed that libelant be paid maintenance at that rate. It was paid down to the date of the trial, January 6, 1944.

I have made Findings of Fact and Conclusions of Law which are being filed together with this opinion. Submit form of judgment for libelant on two days' notice.