**UNITED STATES v. WHITIN MACH. WORKS.**

**Civil Action No. 4299.**

District Court, D. Massachusetts.

Aug. 18, 1948.

William T. McCarthy, U. S. Atty., Gerald J. McCarthy, Asst. U. S. Atty., Putnam,

Bell, Dutch & Santry, and Charles F. Dutch, all of Boston, Mass., and Tompkins, Boal & Tompkins, of New York City, for plaintiff.

Badger, Pratt, Doyle & Badger, Charles C. Petersen, and Paul R. Frederick, all of Boston, Mass., for defendant.

HEALEY, District Judge.

The United States of America brings this action at law to recover both direct and consequential damages allegedly resulting from a breach of a warranty of a flywheel installed on a generator engine aboard the Liberty ship, S. S. Henry Bacon. The defendant is a duly organized Massachusetts corporation with its principal place of business at Whitinsville, Massachusetts.

The plaintiff alleges that the defendant manufactured the flywheel in question for use on a generator engine on a merchant ship; that the defendant impliedly warranted that the flywheel contained no latent defect; that the flywheel in fact contained a latent defect which caused it to disintegrate, and that as a natural and probable result of the alleged breach of warranty, the defendant suffered certain alleged direct and consequential damages.

The defendant's answer denies, (1) that there was any warranty express or implied; (2) that the plaintiff was entitled to rely upon any warranty; (3) that the damages alleged were caused by any negligence on its part or by any defect or unseaworthiness of the flywheel, and that any proper notice of the alleged breach of warranty was given it by the plaintiff. The defendant also alleges that the plaintiff was guilty of contributory negligence.

### Findings of Fact.

1. The plaintiff in 1942 ordered from the defendant a number of generator sets consisting of a generator and engine.

2. Under date of July 6, 1942, the defendant shipped six generator sets to the North Carolina Shipbuilding Company, Wilmington, North Carolina. These generator sets were to be installed in vessels being built for the plaintiff.

3. The engine numbers and generator numbers of the sets so shipped were:

| Engine Number | Generator Number |
| --- | --- |
| 420184 | 1900718 |
| 420189 | 1900804 |
| 420507 | 1900651 |
| 420502 | 1900704 |
| 420196 | 1900752 |
| 420183 | 1900702 |

4. There were installed in the S. S. Henry Bacon the following generator sets:

| Engine Number | Generator Number |
| --- | --- |
| 420507 | 1900651 |
| 420502 | 1900704 |
| 420196 | 1900752 |

These sets were installed in the S. S. Henry Bacon at the North Carolina Shipbuilding Company yard at Wilmington, North Carolina.

5. Article 3 of the General Provisions of the order under which these generators were purchased was as follows:

"Art. 3. Inspection and Tests.—The Contract Products and all workmanship, equipment, materials, and articles incorporated therein shall be the best suited of their respective kinds for the work to be performed hereunder, and shall be subject to inspection and tests by the Buyer, by representatives of the American Bureau of Shipping whenever necessary to entitle them to their intended class, by the Bureau of Marine Inspection and Navigation whenever necessary to entitle the vessels in which they are to be incorporated or installed to a certificate of inspection, and by other Government agencies to the extent required by law or directed by the Buyer. * * * Free access to the Contract Products, wherever they may be, will be given to representatives of the Buyer, American Bureau of Shipping, Bureau of Marine Inspection and Navigation and other Government agencies having cognizance * * *. All inspections and tests will be performed expeditiously, and materials or workmanship not conforming to the plans and specifications rejected by the Inspectors will be promptly replaced by the Vendor. The Buyer reserves the right to make final inspection of

the Contract Products after receipt of same at point of consignment, and any Contract Products rejected after such final inspection will be held for disposition at Vendor's risk and expense and any payment on account thereof will be promptly refunded. * * *"

6. Article 11 of said Purchase Order was as follows:

"Art. 11. Guarantee Period.—If at any time within six (6) months after the acceptance of each vessel supplied with the Contract Products any weakness, deficiency, defect, failure, breaking down, or deterioration in the Contract Products other than that due to wear and tear, or the negligence or other improper act or omission of the Buyer or other operator thereof, shall appear, the Vendor will be required to make good, at its expense any such defects to the satisfaction of the Buyer * * *

"The Vendor shall be informed of all defects and deficiencies discovered during said guarantee period for which it is held responsible, and, whenever practicable, shall be given an opportunity to inspect the same before the defects and deficiencies are remedied, and the decision of the Buyer as to the responsibility of the Vendor for such defects and deficiencies shall be final and binding on the parties to this contract."

7. The defendant furnished certificates of inspection for each of these generator sets. Each of these certificates, identical with the exception of the number of each generator and engine and the assembly number, was as follows:

"The Engine and Generator listed below has been given a running test according to American Bureau of Shipping Standards.

8. The plaintiff made no inspection or tests of the generator sets at the defendant's plant.

9. The generators were given a running test on the Henry Bacon and the United States Maritime Commission Shipyard Inspector's Test Report of the Main Generators & Associate Auxiliaries on the S. S. Henry Bacon, dated 11–21–42, signed by Verne H. Drew, Hull Inspector—Machinery, contained the following report:

"No load and full load speeds were checked. Circuit breakers were set at 125% full load. Parallel operation of cold machines was demonstrated, including reverse current relay operation on each circuit breaker. Thermometers were placed on field coils in each generator, and readings taken at half hour intervals. Volt meters were calibrated to a master meter. Generators were given a four hour run after which parallel operation under various loads was observed. Voltage drop from no load, 20% to 100% loads was noted. 'Megger' readings cold and hot were taken. Operations of both generators and steam engines were satisfactory. * * *"

10. No particular test of the flywheel or of the material in the flywheel of any of the engines of the generator sets installed on the Henry Bacon was made by the plaintiff.

11. On January 18, 1943, while the Henry Bacon was at Balboa, C. Z., the flywheel on her outboard generator fractured, causing injuries to the chief engineer, Charles O. Stokes, and the first assistant engineer, George E. Marsters, and damage in the engineroom.

| | Engine Number | Generator Number |
|---|---|---|
| Assembly G 87 | 420507 | 1900651 |

Shipped To North Carolina Shipbldg. Corp., Wilmington, N. C.

Whitin Machine Works

Date July 18, 1942      Per Estin Hill

Declared to under oath before me this 24th day of Sept. 1942

Albin W. Nelson
Notary public."

12. Under date of July 6, 1943, the following letter was sent to the defendant:

"Whitin Machine Works

"s/s 'Henry Bacon'—injury to Charles Stokes, Chief Engineer, 1/18/43—

"Charles O. Stokes vs. United States of America—Simon N. Gazan, Attorney

"s/s 'Henry Bacon'—injury to George E. Marsters, First Asst. Engineer, 1/18/43— Messrs. Freedman & Goldstein, Attorneys for Claimant.

"According to our records the generator engine installed in the s/s 'Henry Bacon' was manufactured by yourselves. We therefore are placing you on notice on behalf of the owners of the s/s 'Henry Bacon' that we are holding you liable for the injury to Chief Engineer Stokes and First Assistant Engineer George E. Marsters in view of the investigation indicating the accident was due to defective material.

"If your attorneys desire to confer with our attorneys in this matter, you can have them contact Messrs. Tompkins, Boal & Tompkins, 116 John Street, New York, to whom the matter has been referred by us.

"Yours very truly,

"United States of America War Shipping Administration
"By South Atlantic Steamship Line Agts.,
"By E. H. Wilson
"EHW:c
"BC: Tompkins, Boal & Tompkins
"116 John Street
"New York, N. Y."

13. Because of the accident, the sailing of the Henry Bacon was delayed from January 18 to February 6, 1943, a total of nineteen (19) days.

14. The chief engineer, Charles O. Stokes, and the first assistant engineer, George E. Marsters, were hospitalized at the Canal Zone and flown to Philadelphia, Pennsylvania, as soon as they were in proper condition to make the trip.

15. The plaintiff caused a chief engineer and a first assistant engineer to be flown to the Canal Zone to take the places of the injured chief engineer and the injured first assistant engineer.

16. On May 13, 1943, Charles O. Stokes brought a libel in Admiralty under the Jones Act, 46 U.S.C.A. § 688, against the United States in the United States District Court for the Southern District of New York, to recover damages for the injuries sustained by him as a result of being struck by parts of the flywheel of the generator when it fractured. By paragraph nine of said libel, he averred that he intended to rely upon the doctrine of res ipsa loquitur to establish the negligence complained of.

17. George E. Marsters, the first assistant engineer, brought an action at law against South Atlantic Steamship Line, the general agent of the S. S. Henry Bacon, in the United States District Court for the Eastern District of Pennsylvania. In this he sought compensation for the damages he sustained.

18. By letter dated September 25, 1943, the defenses of both the admiralty action brought by Stokes and the law action brought by Marsters were duly tendered to the defendant.

19. The defendant did not accept the defense of either suit or take any part in it or give any aid in connection therewith.

20. The plaintiff settled the suit of George E. Marsters, the first assistant engineer, by paying him the sum of $8,500. It also paid to Krusen, Evans & Shaw, the attorneys handling the defense of the action, $1,000.08 for their services and disbursements. It incurred other expenses in connection with the suit of $374.45, making a total expenditure on account of the Marsters case of $9,874.53. All of these payments were reasonable and reasonably incurred.

21. On motion of counsel for Stokes heard at the opening of the trial of the Stokes case on January 5, 1944, the libel was amended so as to change the word "negligence" wherever it occurred therein to "unseaworthiness"—in effect, changing the libel from one brought under the Jones Act to one brought under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq.

22. No notice of the motion to amend the libel, or of the amendment to the libel, was given to this defendant, nor was the defense of the libel as amended tendered to this de-

fendant. Although given an opportunity to seek an adjournment of the trial, this plaintiff failed to do so, and the trial began forthwith.  . .

23. The plaintiff paid Stokes prior to institution of suit, $850 on account of wages to the end of the voyage, and, prior to the trial in the District Court, $720 maintenance.

24. The following findings of fact made by the court in the Stokes case are hereby adopted and made a part of my findings of fact:

"1. The SS Henry Bacon loaded her first cargo at Philadelphia and proceeded on December 29, 1942 to anchorage at New York. She did not dock at New York. From her New York anchorage she went to Cuba, to Colon and through the Panama Canal to Balboa.

"2. The SS Henry Bacon was equipped with three dynamos, designated as the inboard, middle and outboard generators. Each dynamo is driven by a single cylinder steam engine. Only two generators are used at a time; one is always idle.

"3. On each engine is a flywheel which smooths out the action of the engine. Mounted on the flywheel is a governor. This governor controls the speed of the engine. As the flywheel tends to increase in speed the governor functions automatically to cut down the steam going to the cylinder, and in this way keep the speed fairly constant.

"4. These generator engines are of good design and are standard. There are thousands of them in use. They are fit and appropriate for the purpose for which they are used. The governor is also of good design and is appropriate for the engine of which it is a part. The generator engines were designed to run at a speed of 400 R.P.M. (revolutions per minute) with a load, and 410 R.P.M. with no load. When the load is suddenly lost these engines will immediately speed up to 430 or 440 R.P.M. per minute, but the governor should bring the speed down to 410, in one or two seconds. The flywheel is covered with a casing of tin for the protection of the engine room personnel. The dynamos make electricity for the ship's lights and auxiliaries.

"5. There are circuit breakers located on the switch board which will kick out and break the circuit when there is danger of damage to the generator because of the load thereon. The circuit breakers work like a fuse. When the circuit breakers kick out the circuit is broken, no electricity is generated and the load is taken off the engine operating the generator.

"6. On the morning of January 18, 1943, the SS Henry Bacon was at Balboa, C. Z. The engines were being warmed up preparatory to sailing. The first assistant engineer, George E. Marsters, was on watch in the engine room. The outboard and middle generators were running. About 5:30 A.M. the circuit breakers kicked out, the lights went out and the engine driving the starboard or outboard generator speeded up greatly. Its speed was indicated by the noise which it made and the vibration produced. The first assistant engineer, George E. Marsters, put on the emergency lights, went from the floor plates to the dynamo platform, tried to adjust the circuit breakers on the switchboard and then went over to the steam valve on the steam line to the generator engine and was turning the valve when the flywheel fractured.

"7. At the time the circuit breaker kicked out, which cut off the dynamos, and left the vessel in darkness, libelant was in his stateroom adjoining his office. He immediately proceeded to the engine room to find out what was the trouble. On his way down he could feel the heavy vibration of some machine, and when he reached the engine room he found that the outboard generator was running at excessive speed. At this time the first assistant engineer, Marsters, was turning the steam valve on the outboard generator in an effort to control its speed by reducing the steam supply and, while so engaged, the flywheel of said outboard generator flew apart and injured both the libelant, Stokes, and the first assistant engineer, Marsters.

"8. The fracture of the flywheel was caused by the excessive speed of the engine. This was in turn caused by the failure of the governor to check that speed. The porosity of the cast iron in the flywheel made it more liable to burst and break apart

with the increased centrifugal force of the speeding engine.

"9. The failure of the governor to check the speed of the engine was due to some defect, which cannot be determined because the generator was completely destroyed when the flywheel burst asunder.

"10. The disintegration of the flywheel was due to the unseaworthy condition of the governor of the flywheel, and its component parts, and to the unseaworthy condition of the flywheel itself."

25. The judge of the District Court, 55 F.Supp. 56, also found that Stokes was contributorily negligent and, therefore, apportioned damages 70% due to unseaworthiness and 30% due to the negligence of Stokes, the chief engineer.

26. On appeal, the Circuit Court of Appeals for the Second Circuit, 144 F.2d 82, 84, reversed the District Court's finding in part, by finding there was not sufficient evidence to support the finding that Stokes was guilty of contributory negligence, and increased his damages to $44,433.12, together with interest at the rate of 4%. This decree was satisfied by payment of $44,600.98 to Stokes.

27. In his opinion, Justice Frank of the Circuit Court of Appeals wrote: "* * * there is sufficient evidence that the flywheel was defective, and that, if it had not been, the generator could have been stopped in sufficient time, on January 18, 1943, to prevent the bursting of the flywheel."

28. The plaintiff incurred other expenses in the sum of $452.41, all of which were reasonable and reasonably incurred.

29. It incurred the expense of $484.60 in sending two relief engineers to the Henry Bacon. These items of expense were reasonable and reasonably incurred.

30. It expended in connection with both cases, including counsel fees and disbursements in the Stokes case, $3,701.39, all of which were reasonable and reasonably incurred.

31. In connection with the damages of the vessel, it incurred expenses of $15,309.14, all of which were reasonable and reasonably incurred.

32. The flywheels on the generator engines were designed and intended to have a safety factor of at least ten, which is the usual safety factor and was in the contemplation of the parties.

33. The flywheel fractured on January 18, 1943, while the SS Henry Bacon was at Balboa, Canal Zone. Repairs were made of the damage done and on February 6, 1943, the vessel continued on her voyage which did not terminate until August 24, 1943, when the ship arrived in the port of New York. Between February 6 and August 24, 1943, she had not been in any port in the western hemisphere.

34. On January 19, 1943, the day after the accident occurred, photographs now in evidence, were taken of portions of the flywheel.

35. The American Bureau of Ships' manual calls for flywheels and similar parts to be made with iron with a tensile strength of 20,000 pounds per square inch. A flywheel made of iron with a tensile strength of 20,000 pounds per square inch will not burst until it reaches a speed in excess of 2,600 R.P.M.

36. It was within the contemplation of the parties to the contract that the flywheels on the generator engines would be so constructed as to be able to withstand 440 R.P.M. with a safety factor of ten without bursting.

37. There was an implied warranty by the defendant that the flywheel would contain no latent defect.

38. The cause of the fracture of the flywheel on January 18, 1943, was a defective condition of the casting; a latent defect which could not have been discovered by the operating test applied by the plaintiff's agents, nor by any reasonable inspection or test made by the plaintiff nor by any test or inspection that it was within the contemplation of the parties that the plaintiff should make.

39. The flywheel would not have fractured under the circumstances present on January 18, 1943, if it had not been defective.

40. No negligence or other act of the plaintiff, its agents or servants was the

proximate cause of the fracture of the flywheel.

41. The plaintiff, its agents or servants were not guilty of contributory negligence.

42. The latent defect in the flywheel constituted a breach of warranty by the defendant.

### Discussion.

The plaintiff seeks recovery in this action of certain consequential damages allegedly flowing from the defendant's breach of an implied warranty of the flywheel on a generator engine set. This flywheel fractured, while the engine on which it was installed was being "warmed up" on January 18, 1943, causing injuries to two members of the crew of the SS Henry Bacon and damage to the engines and other equipment in the engineroom.

The plaintiff does not contend that it is entitled to recover any money as consequential damage under any express warranty contained in the contract, but argues that Article 11 of the Contract provisions does not preclude the existence of the implied warranty, upon the breach of which it relies for recovery in this action.

■ There is nothing in the contract in question to establish that the usual warranties implied under the Sales Act, Gen. Laws (Ter.Ed.) Mass. C. 106, § 1 et seq., were not within the contemplation of the parties when the contract was made. Therefore, if the defendant breached any implied warranty, the plaintiff is entitled to recover all elements of damage, direct or consequential, which it proves were the natural and probable result of such breach. Williston on Contracts, Rev.Ed., Sec. 1393.

■ The defendant who sold the generator engine sets of its own manufacture to the plaintiff, impliedly warranted that those sets and their component parts were constructed in a workmanlike manner of proper materials, and that they contained no defects which were not discoverable by the plaintiff or its agents or servants on a reasonable examination.

■ Thus, if the flywheel in question fractured because of any latent defect caused by improper workmanship or infe-rior material in its construction, the plaintiff who, under the circumstances had a right to rely upon the skill and judgment of the defendant, who knew the purpose for which the flywheel was to be used, is entitled to recover all damages resulting from its fracture, provided the plaintiff gave the defendant notice of the alleged breach of warranty within a reasonable time after the plaintiff knew of the breach of warranty.

Since the defendant contends that the plaintiff cannot recover in any event because it failed to give the defendant notice of the breach within a reasonable time, it is necessary to dispose of the question of notice at the outset. The defendant does not deny that the letter dated July 6, 1943 was sent by the plaintiff's agent and received by the defendant, but it asserts (1) that since the accident occurred on January 18, 1943, the notice was not timely, and (2) that, since it referred only to the injuries of Stokes and Marsters, it was not a notice that the plaintiff intended to seek to recover other consequential damages.

■ The notice required by the Sales Act, General Laws of Massachusetts (Ter. Ed.), Chap. 106, § 38, is: "[a] notice to the seller of the breach of any promise or warranty * * *." The purpose of the required notice is to protect the seller against belated claims for damages which prevent him from making an adequate and proper investigation of the cause of his alleged liability, Idzykowski v. Jordan Marsh Company, 279 Mass. 163, 181 N.E. 172; Johnson v. Kanavos, 296 Mass. 373, 6 N.E. 2d 434, and also to enable him to take any reasonable steps to minimize the damages for which he may become liable. Texas Motor Coaches, Inc., v. A. C. F. Motors Company, 3 Cir., 154 F.2d 91. No particular form or method of giving notice is prescribed; Johnson v. Kanavos, supra. "Although it need not necessarily take the form of an express claim for damages or threat of such it ought to be reasonably inferable therefrom that the buyer is asserting a violation of his legal rights." Nashua River Paper Company v. Lindsay, 249 Mass. 365, 370, 144 N.E. 224, 225. The let-

ter of July 3, 1943 was in effect a notice of a breach of warranty in that the generator set contained defective material and that the plaintiff intended to hold the defendant liable therefor, even for consequential damages. It was, therefore, a sufficient notice upon which the plaintiff could assert its rights for breach of warranty, if, under the circumstances, it was reasonably timely.

■ Although the accident occurred on January 18, 1943, and the notice was not sent until July 6, 1943, the notice was sufficiently timely under the circumstances. There is no evidence as to when the government authorities or their agents determined that the flywheel was defective. Also, even if there were such evidence, the court takes judicial notice of the fact that the United States was then at war, that for security reasons it took a long period of time to obtain clearance through the Navy and other governmental departments for information concerning vessels and other instrumentalities connected with the war effort. Also, even though the notice were given the defendant at an earlier date, the circumstances were such that the defendant's position would not have been improved in any substantial particular.

We, therefore, come to a determination of the merits of the questions as to, (1) whether the flywheel was actually defective, (2) if it were defective, whether the defect was the proximate cause of the accident, and (3) whether Stokes, Marsters, or any other agent or employee, for whose acts the plaintiff was responsible, was contributorily negligent.

The plaintiff relies upon the findings of fact and judgment in the case of Stokes v. United States tried in the United States District Court for the Southern District of New York, 55 F.Supp. 56, as modified by the Circuit Court of Appeals for the Second Circuit, 144 F.2d 82, and upon the parts of the fractured flywheel to prove that the flywheel was defective, and that the defect in the flywheel was the proximate cause of the accident from which its alleged damages resulted as natural and probable consequences.

On the other hand, the defendant contends that it is not bound in this case by the judgment in the Stokes case, because it did not receive a proper notice to defend that suit. It has, therefore, offered in evidence the testimony of two expert witnesses to prove (1) that the flywheel was not defective; (2) that even though the flywheel was defective, such defect was not the proximate cause of the accident, and (3) that the alleged negligence of Charles O. Stokes, the chief engineer on the SS Henry Bacon, or the act of George E. Marsters, the assistant engineer, was the proximate cause, or at least, a contributing cause, of the accident.

Since, in deciding the issues in the Stokes case, it was necessary for the courts to determine what was the proximate cause of the accident and whether Stokes was contributorily negligent, and since that decision on those questions is binding on this defendant if the plaintiff made a proper tender of this suit to the defendant, it is necessary to consider the validity of the tender of the defense of that suit to the defendant.

Stokes' libel in admiralty, filed May 13, 1943, contained the following allegations:

"8. Libellant alleges that on the 18th day of January, 1943, about 5:30 A.M. while the said vessel was afloat in navigable waters at Balboa in the Panama Canal Zone, and while he was in the performance of his duties and in furtherance of the business of his employer and being then and there in the engine room of said vessel, that all of a sudden the flywheel of the generator flew apart and fragments struck libelant about his head and right foot and leg inflicting serious injuries.

"9. Libelant alleges that he intends to rely upon the doctrine of res ipsa loquitur to establish the negligence complained of."

By letter dated September 23, 1943, the defense of this action and of an action brought by George E. Marsters was tendered to this defendant. The defendant did not accept this tender or show any interest in taking part in the defense of this action. At the opening of the trial of the

Stokes case, his libel was amended to allege unseaworthiness instead of negligence. No notice of this amendment was given to this defendant, nor was a tender of the suit as thus amended made to this defendant. Thus, this defendant claims that it is not bound by the decision in the Stokes case, since by the amendment, the entire cause of action was changed and a new cause of action asserted.

When the defendant was given a tender of the defense of the Stokes case, accompanied by a copy of the libel filed therein, it had notice that Stokes claimed that his injuries were caused by the fracture of the flywheel. While, as defendant contends, it was necessary for Stokes to show that this plaintiff was negligent as to Stokes, and that such negligence was the proximate cause of the injury, since Stokes relied upon the doctrine of res ipsa loquitur, it was quite possible that the type of negligence which Stokes should be able to prove would not foreclose this plaintiff from recovering over against this defendant. Cf. Washington & Berkeley Bridge Company v. Pennsylvania Steel Company, 4 Cir., 215 F. 32, 35; Inhabitants of Westfield v. Mayo, 122 Mass. 100, 23 Am.Rep. 292; Consolidated Hand-Method Lasting-Machine Company v. Bradley, 171 Mass. 127, 50 N.E. 464, 68 Am.St.Rep. 409; Boston Woven Hose & Rubber Company v. Kendall et al., 178 Mass. 232, 59 N.E. 657, 51 L.R.A. 781, 86 Am.St.Rep. 478. Also, by defending that action, the defendant could have had an opportunity in that action to negative any liability on its part by showing that, in fact, the flywheel was not defective, or that any defect in the flywheel was not the cause of the accident. I am, therefore, of the opinion that this defendant, having received a proper tender of the defense of the Stokes suit, and having refused to accept that tender, is bound by the findings of the court insofar as any issues material to this case were decided therein.

This conclusion is buttressed by the fact that the defendant is presumed to have known that Stokes by amendment might have changed the ground of his cause of action, even after verdict, under the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

The issues in the Stokes case, which had to be determined in Stokes' favor in order that he recover on the amended libel, were:

(1) was the SS Henry Bacon unseaworthy?

(2) was that unseaworthiness the proximate cause of the accident?

And (3) was Stokes contributorily negligent?

He did not, however, have to show the negligence of this plaintiff to recover on the ground of unseaworthiness. McGhee v. United States, 2 Cir., 165 F.2d 287; The H. A. Scandrett, 2 Cir., 87 F.2d 708. Had this defendant accepted the tender of the Stokes case, it could have submitted evidence on any of these questions and thus protected itself. It is, therefore, bound by the decision of the court in the Stokes case insofar as that judgment was dependent upon a resolution of any of these issues.

In the Stokes case, Judge Leibell found that "the disintegration of the flywheel was due to the unseaworthy condition of the governor of the flywheel, and its component parts, and to the unseaworthy condition of the flywheel itself." He also found that Stokes was contributorily negligent in not having discovered the defect in the governor and not having repaired it. The Circuit Court of Appeals, in modifying the decision of Judge Leibell, insofar as it related to the contributory negligence of Stokes, found that " * * * there is sufficient evidence that the flywheel was defective, and that, if it had not been, the generator could have been stopped in sufficient time, on January 18, 1943, to prevent the bursting of the flywheel"—in other words, that no defect in the governor caused the accident.

In the light of these findings, it is not open to the defendant to prove that the flywheel was not defective, that the defect in the flywheel was not the proximate cause of the accident, or that Stokes was contributorily negligent.

Although in this case the defendant seeks to show what, in effect, would be the negligence of Stokes, by the testimony of experts that the accident would not have happened had the governor been properly oiled, it is not a liberty to assert this defense in this action; first, because of the finding that the defect in the flywheel was the proximate cause of the accident; and secondly, because of the finding that Stokes was not contributorily negligent. Such a defense would have been open to the defendant in the Stokes case had it availed itself of the tender of the defense of that case, and is, therefore, foreclosed to it now.

In the Stokes case, the evidence concerning the conduct of George E. Marsters was properly before the court on the question as to what was the proximate cause of the accident. If in that case the court had found that the conduct of Marsters, rather than the defective flywheel, was the proximate cause of the accident, Stokes could not have recovered on the ground of unseaworthiness. Thus, the question as to what Marsters actually did was necessarily decided in the Stokes case.

Judge Leibell made the following findings regarding the conduct of Marsters:

"9. * * * The first assistant engineer, George E. Marsters, put on the emergency lights * * * and then went over to the steam valve in the steam line to the generator engine and was turning the valve when the flywheel fractured.

"10. * * * At this time the first assistant engineer, Marsters, was turning the steam valve on the outboard generator in an effort to control its speed by reducing the steam supply."

These findings, which were in no way disturbed by the Circuit Court of Appeals, are binding on this court. However, even though said findings were not binding on this court, there is insufficient evidence to rebut them in the event that they were to be considered only as evidence.

The defendant has presented the testimony of an expert in an attempt to show that the accident was caused by the act of Marsters in closing the exhaust valve while the engine was racing. This expert opinion was based on the contradicted testimony of Stokes in the Stokes case, and on the type of damage to certain parts of the generator set. Having considered the evidence set forth in the record of the Stokes case, I am of the opinion that Marsters was actually engaged in closing the throttle valve at the time of the accident, as found by Judge Leibell. Thus, the opinion of defendant's witness was based upon an unwarranted premise. Also, insofar as that opinion was based upon the damage to certain parts of the generator set, it appears more conjectural than certain and conclusive.

I, therefore, conclude that there is no basis for finding that any act of Marsters contributed in any manner to the accident in question.

I further find that, since a latent defect in the flywheel, supplied by this defendant and impliedly warranted by the defendant to contain no latent defect, was the proximate cause of the accident, and since no negligence for which the plaintiff was responsible contributed to the accident, the plaintiff, who gave the defendant notice of the breach of warranty within a reasonable time after it learned of said breach, is entitled to recover damages for all the natural and probable injuries sustained by it as a result of the breach.

The plaintiff, having tendered to the defendant the defense of both the suit of Stokes and that of Marsters, which tender was not accepted, is entitled to recover the amounts paid to Marsters as a reasonable settlement of his suit, plus reasonable attorneys' fees and expenses, and the amount paid in satisfaction of the judgment of the Stokes case, plus reasonable attorneys' fees and expenses, Westfield v. Mayo, supra, plus any sums paid for maintenance and cure of both engineers.

The plaintiff is also entitled to recover all reasonable items of expense incurred by it as a natural and probable result of the breach of warranty, including the transportation of two engineers to replace Stokes and Marsters, the repair of the ves-

sel and the cost incurred by the vessel being delayed at Balboa.

### Conclusions of Law.

1. By its contract, the defendant warranted that the flywheel in question contained no latent defect.

2. Delivery of the flywheel with a latent defect in its casting constituted a breach of warranty by the defendant.

3. The latent defect in the flywheel was the proximate cause of its disintegration on January 18, 1943.

4. Plaintiff gave defendant ample notice of the alleged breach of warranty within a reasonable time.

5. Defendant in this case is bound by the determination in the Stokes case that the flywheel was defective, that the defect was the proximate cause of the disintegration of the flywheel; that Stokes was not guilty of contributory negligence, and that Stokes was entitled to damages in the sum of $44,433.12, plus interest and costs.

6. Defendant is liable to plaintiff for all damages and reasonable expenses reasonably incurred by the plaintiff as a natural and probable consequence of the breach of warranty.

7. Plaintiff is entitled to recover from defendant $75,993.05 (being the sum of the following items:

| | |
|---|---|
| (a) Stokes judgment. | $44,600.98 |
| (b) Stokes wages to end of voyage. | 850.00 |
| (c) Maintenance payments to Stokes. | 720.00 |
| (d) Marsters settlement & expense. | 9,874.53 |
| (e) Other expenses. | 452.41 |
| (f) Expense of sending replacements for Stokes and Marsters. | 484.60 |
| (g) Expenses in connection with both cases, including counsel fees and disbursements. | 3,701.39 |
| (h) Repairs of damage to vessel and expenses incurred by delay of vessel. | 15,309.14 $75,993.05) |

together with interest thereon from the respective dates of payment of each item.

The parties will prepare an order for judgment for the plaintiff in accordance with this opinion and submit it to the court for approval.