**COWAN**

v.

**INLAND WATERWAYS CORP. et al.**

No. 2223.

United States District Court
E. D. Illinois.

March 13, 1954.

684

Cohn & Cohn, E. St. Louis, Ill. (Joseph Cohn, E. St. Louis, Ill., of counsel), Douglas MacLeod, St. Louis, Mo., for libelant.

C. M. Raemer, U. S. Atty. for Eastern Dist. of Illinois, Salem, Ill., Ernest R. McHale, Asst. U. S. Atty., for Eastern Dist. of Illinois, E. St. Louis, Ill., for respondent.

WHAM, Chief Judge.

James S. Cowan, libelant herein, filed suit under the general maritime law pursuant to provisions of Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., for damages sustained as a result of personal injuries which he received while he was employed as a deckhand by the Inland Waterways Corporation, a wholly owned instrumentality of the United States, which said corporation operates vessels as a commercial carrier of freight on the navigable inland waters of the United States.

Respondents contested the jurisdiction of this court and libelant's right to maintain this suit both by exceptions and by answer asserting that libelant's exclusive remedy for such injuries was to be found pursuant to the provisions of the Federal Employees Compensation Act, 5 U.S.C.A. § 751 et seq., as libelant was an employee of the United States by reason of the fact that he was in the direct employment of an agency of the United States. The exceptions were overruled and the case proceeded to trial.

At the trial libelant presented evidence upon the questions of unseaworthiness of the vessel, how injury to libelant occurred, and the amount of damages sustained by him. Allegations of the amended libel charging negligence and seeking recovery for maintenance and cure were withdrawn.

The evidence shows that James Cowan was employed as a deckhand by the Inland Waterways Corporation, and commenced to work on board the towboat M/V Harry Truman on September 4, 1950. He was to be paid at the rate of $6.97 per day, and to receive subsistence and quarters while on the boat evaluated at the rate of $6 per day. For each day of active duty on board the vessel, libelant was to receive one-half day shore leave at full pay. While on shore leave he would not receive his subsistence and quarters. Under this arrangement libelant would, while steadily employed, receive full pay for

every day and subsistence and quarters for two-thirds of the days of his steady employment. Libelant had previously worked as a deckhand for respondents and for various other employers, but this was his first day as an employee of the respondents under the employment agreement under which he was employed when injured.

On September 5, 1950, the said vessel was engaged in moving a tow of barges in a northerly direction up the Mississippi River from Alton, Illinois. The barges in the tow were coupled together by means of wire cables which were attached to certain fittings on the decks of the barges, and such cables were then drawn tight to secure the barges together in a compact tow by means of a manually operated winch fastened to the deck of the barge.

The winch here in question consisted of a cog wheel attached to the end of a metal drum, to which the end of the steel cable was fastened. This drum was mounted in a horizontal position within a heavy steel framework and was rotated by means of detachable cranks which were engaged with a shaft running horizontally through the steel framework over and above the metal drum. Cog wheels on the said shaft meshed with the cog wheel on the drum forming a system of gears which transmitted the power exerted on the cranks to the drum, causing the same to rotate and draw taut the steel cable which coupled the barges together. A dog, fastened to the frame of the winch, was positioned to catch in the cog wheel on the end of the drum and thus secure the drum in position after the cables were taut and the power manually transmitted through the cranks had been withdrawn and to prevent the drum from rotating in a reverse direction when the cranks were removed. The winch was also equipped with a braking device which was controlled by foot pedals located on three sides of the winch intended to hold the drum in position and prevent the drum from rotating when

such brake was applied. Before the occurrence at a time unknown to libelant the brake on the winch in question had been unshipped and was not effective or in use at the time of the occurrence. This left the dog as the only remaining means of controlling the drum or holding it when the power transmitted through the cranks was lessened or withdrawn.

At about 8:30 a. m. on September 5, 1950, libelant and two other deckhands were engaged in tightening the cables between the barges by means of the winch. Two cranks were attached to the shaft of the winch, one crank at either end and on opposite sides of the framework. Libelant and a deckhand by the name of Luster operated one of the cranks, and a deckhand by the name of Jones operated the crank on the opposite end of the shaft. When the cable had been drawn in by the rotation of the drum to the desired tension, Jones detached the crank which he was operating, placed the dog in position to hold the drum and it held momentarily. Luster took his hands from the crank handle and libelant was in the act of detaching the crank which he and Luster were using when the dog slipped and failed allowing the drum to spin, causing the crank handle to strike the libelant with great force just above the left temple rendering him unconscious and resulting, as learned later, in a compound, comminuted depressed fracture of the skull and serious brain injury.

Thereupon the barges were brought in to shore and an improvised gangplank was laid from the barge to the shore. Libelant was carried to the gangplank but regained sufficient consciousness to walk from the barge to the shore with assistance. He was taken in an ambulance to a hospital in Alton, Illinois. There he was examined and was removed to Barnes Hospital in St. Louis, Missouri for immediate brain surgery. During the time he was in Barnes Hospital two operations were performed on his brain and skull above the left temple,

pieces of the skull were taken from the brain and a portion of the skull was removed. He remained in Barnes Hospital until November 8, 1950 when, without being released, he left the hospital and returned to Mound City, Illinois where he maintained his home with his wife, Ila Mae Cowan. On November 10, 1950 a form for "Notice of Claim", another for "Claim for Compensation on Account of Injury", and another for "Election" to receive benefits under the Federal Employees' Compensation Act in lieu of other remedies were forwarded by mail to libelant at his said home. The second form was signed by libelant by his mark, sworn to before a notary public, and the signature was witnessed by his wife, Ila Mae Cowan, and one Sylvia Ferguson, a neighbor. The "Notice of Claim" and the "Election" were likewise signed by libelant by his mark and witnessed by the same witnesses.

The above forms were received by libelant with a letter dated November 10, 1950, signed by C. S. Murray, personnel officer, by J. S. Sheehan, personnel assistant, with request to sign and return and after being signed they were returned pursuant to the request in the letter.

A "Claim for Continuance of Compensation on Account of Disability" dated February 28, 1951 and bearing a handwritten signature of libelant was forwarded to the United States Employees' Compensation Commission. On February 19, 1951 an award of compensation was made by the Bureau of Employees' Compensation of the Department of Labor, wherein libelant was awarded an amount of $623.28 to cover the period from September 5, 1950 to February 7, 1951, and provision was made for future compensation at the rate of $112.24 for each four weeks from February 7, 1951. Pursuant to this award checks were forwarded to the libelant and were endorsed with his name in the total amount of $1,081.24. The last check so endorsed bears the date of May 31, 1951. Further checks were issued in the amount of $112.24 each, dated June 28, 1951; July 26, 1951 and August 23, 1951, but were not cashed by libelant. On July 19, 1951 the present action was filed in this court. Checks in the total amount of $1,859.27 were also issued to cover the doctor and hospital bills of libelant.

Since the date of the injury libelant has been totally and permanently disabled from performing any useful or remunerative employment. He is unable to talk plainly or coherently, comprehends very slowly and with great difficulty what is being said to him and is unable to answer questions until after long thought and then very slowly and only in part. Libelant has suffered serious impairment of body and mind, has undergone personality changes, is subject to seizures in the nature of epilepsy which affect the right side of his body and result in loss of consciousness. Since receiving the injury he has changed from an ordinarily healthy, happy, gregarious individual to a person who is weak, inactive, morose, irritable and depressed. The evidence shows that as a result of the injury he suffers from a severe aphasia and from post-traumatic epilepsy with impairment of memory and intelligence.

The issues presented in the case are: (1) Did the libelant have a choice of remedies? (2) Did the libelant make an election of remedies which precludes him from recovering damages in this action? (3) Did the respondents furnish libelant with an unseaworthy appliance with which to perform his duties and if so was such unseaworthy equipment the proximate cause of the injury to libelant? (4) What amount of damages should be awarded to libelant, if any?

Under the evidence each of the issues must be decided favorably to libelant. Libelant is entitled to a proper award of damages in an amount to be determined from the proof.

That libelant had a choice of remedies was decided prior to the trial in the court's memorandum filed herein on July 2, 1953 which overruled exceptions to the libel asserting want of jurisdiction. By agreement of counsel, after said exceptions were filed, this case had been delayed to await a decision of the United States Court of Appeals in the case of Inland Waterways Corp. v. Doyle involving the same jurisdictional question. On June 16, 1953 that case, 8 Cir., 204 F.2d 874, was decided unfavorably to the government's contention. The libelant who, as in this case, had been injured in course of duty while on a merchant vessel owned and operated by the Inland Waterways Corporation, as distinguished from a Public Vessel, was held to have a remedy under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq. I followed said Eighth Circuit decision and adhere to that view.

As to whether libelant had made a binding choice of remedies prior to bringing this suit a question of fact arises. At the time libelant signed by his mark the document entitled "Election" on November 13, 1950 and by other documents claimed Federal Employees' Compensation he had been home from Barnes Hospital but a few days. On September 5, 1950 he had received a nearly fatal skull and brain injury. At Barnes Hospital he had undergone two unusually serious operations. The injury and the operations had left him seriously affected in both mind and body. He was neither mentally nor physically recovered from the effects of his injury and said operations sufficiently to be able to give any proper consideration to a choice of remedies or to understand the significance of the documents he signed as they related to a choice of remedies or operated as a waiver of rights. From the evidence it seems plain that until he and his sister talked with Attorney Cohn in June or July, 1951 libelant had no understanding or comprehension of his rights or that he had a choice or election of remedies. My conclusion is that the first real choice or election of a remedy was made by libelant when, under the advice of counsel, he refused to accept and cash further compensation checks and authorized this suit to be brought under the Suits in Admiralty Act.

It is the settled rule of Admiralty Law that the owner of a vessel and the vessel itself are liable to indemnify a seaman for an injury which he suffers as a result of the unseaworthiness of the vessel or its appurtenant appliances and equipment. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; The Arizona v. Anelich, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075; The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; and the showing by the owner that he was in exercise of due diligence does not constitute a defense to a claim based upon unseaworthiness; Mahnich v. Southern Steamship Co., supra; Seas Shipping Co. v. Sieracki, supra; Petterson v. Alaska Steamship Co., 9 Cir., 205 F.2d 478; The Seeandbee, 6 Cir., 102 F.2d 577; The H. A. Scandrett, 2 Cir., 87 F.2d 708.

Seaworthiness has been defined as the sufficiency of a boat or vessel in materials, construction, function, equipment, officers, crew and outfit for the trade or service in which it is being employed. McLeod v. Union Barge Line Co., D.C., 95 F.Supp. 366, affirmed 3 Cir., 189 F.2d 610. Seaworthiness or unseaworthiness of a boat and its appurtenant appliances and equipment is a question of fact. Here the specific question of fact for determination is whether the winch being operated by the libelant and the other employees at the time of his injury was faulty and inadequate or reasonably sufficient for the purpose for which it was intended to be used. The respondents were not insurers of libelant's safety. The law does not require the ship owner to supply the best or perfect equipment and appli-

ances but only those that are reasonably safe and suitable. Doucette v. Vincent, 1 Cir., 194 F.2d 834; The Cricket, 9 Cir., 71 F.2d 61; Ruberry v. United States, D.C., 93 F.Supp. 683. The burden of proving unseaworthiness and that such unseaworthiness, if any, was the proximate cause of his injury is upon libelant. Grillo v. United States, 2 Cir., 177 F.2d 904.

Libelant sets out four ways in which it is contended that the winch in question was inadequate and unseaworthy.

1. The frames of the winches of this series were not sufficiently strong to withstand the strains imposed in this work, causing component parts of the winches to be bent out of position.

2. The crank handles were dangerous, due to the projecting bar or hand grasp, and the inability of an operator to maintain an even pull on this handle, and that a wheel type handle which was put into use after the injury here in question is a safer and better method of operating the winch.

3. The dog, which was supposed to engage in the teeth of the drum cog to secure the drum in position was inadequate for the purpose for which it was used, and failed to hold the drum in position.

4. The brake on the winch had been unshipped or disconnected, because it was defective, requiring the operators to rely exclusively on the cranks and the dog while the drum was under tension, and requiring the crank last removed to be removed without the safeguard of a brake.

A review of the entire evidence leads me to the conclusion that there is proof in the record in support of each of the four ways in which libelant charges that the winch was inadequate and unseaworthy. There is no proof that libelant or any of his fellow employees was guilty of any act of negligence during the operation in which libelant was injured resulting in the failure of the winch to perform its intended purpose so that it can reasonably be said that the winch was seaworthy but failed due to the negligence of its users.

There is proof that the winch was equipped with a brake which had been unshipped. If it had been available for use while the cranks were being detached and had been used the libelant would have been able to detach his crank without his safety being wholly dependent upon the dog performing its function and in ample time to have avoided injury in case of its failure. With the brake unshipped, permitting the full force of the tension applied through the crankshaft in operating the winch to react upon the cog wheel and the dog with a suddenness that the brake would have eased and modified, the strain upon the framework of the winch was undoubtedly much more severe than if the brake had been operative and applied. It seems reasonable to conclude that the framework of the winch was not of sufficient weight and strength to remain unaffected by the long-continued and severe use made of it without the benefit of the brake which was a proper and essential part of the appliance. That the effect of the unintended strain upon the frame affected the natural relation of the cog wheel to the dog seems a reasonable inference. For the dog to be efficient and safe for its intended purpose it should have been positioned at all times so as safely to catch and hold the cog wheel without need of manual placement. The evidence shows that, at the time in question, one of the employees found it necessary to place the dog in position to engage the cog wheel and even then it slipped and failed. Whether the failure of the dog was due to effect of repeated strains upon the frame affecting the intended position of the cogs so the dog did not catch and hold securely which seems reasonable, or whether the dog itself was improperly and defectively installed so that it failed properly to engage and hold the cogs as intended, the winch was unseaworthy as relates to the cog wheel and dog. The

detachment of the brake added to the unseaworthiness of the winch. With the winch in defective condition due to the detachment of the brake and the faulty operation of the cog wheel and dog the danger to libelant of using the cranks with projecting handles was greatly increased when the manually applied power was withdrawn from the shaft, in reliance upon the dog safely engaging with the cog wheel so as to hold the drum securely and enable the crank to be removed without danger.

I find from the greater weight of the evidence that the winch in question was an unseaworthy appliance and that its unseaworthiness was the immediate cause of the injury suffered by libelant.

The recoverable damages suffered by libelant must be determined from a number of pertinent factors many of which appear in the earlier statement of facts. At the time he was injured he had been working but part of a day under a contract by the terms of which, had he worked steadily, he would have earned $4,004 per annum. What his earnings had been prior to the accident does not appear. He was forty-seven years of age and had a life expectancy of approximately twenty-four years. Before his injury he was, generally speaking, in good health, able-bodied and had been physically and mentally capable of performing the type of work in which he was engaged at the time of his injury. He had done so intermittently for many years. That he lacked perfect physical condition appears from the fact that he had been in the military service and was drawing government compensation on the basis of forty per cent disability due to arthritis. This disability did not prevent him from engaging satisfactorily in the type of work required of a deckhand. His disability following his injury was total and permanent from the standpoint of engaging in remunerative employment which one of his education and training could perform. He had received a seventh grade education and his training was that of a laborer. He is disfigured by a depressed scar on the side of his head and his entire appearance reflects the severe mental, nervous and physical strain and suffering experienced by him following the injury. He will continue to suffer both mentally and physically. As a result of the injury he suffers epileptic seizures, severe aphasia, depressed moods and extreme nervousness.

It appears from the evidence that libelant has and will continue to receive medical treatment and hospitalization, as needed, without cost and those factors may be eliminated in calculating the damages he is entitled to recover. Before he ceased cashing the compensation checks he had received $1,081.24 on account of the injury.

Taking into consideration the amount of money as well as the maintenance and cure he has already received and considering what will be a fair and just additional compensation for his loss of wages past and future, his disfigurement, his pain and suffering past and future, and his mental pain and suffering past and future and his humiliation and embarrassment past and future arising proximately from his injuries I find that libelant is entitled to receive as fair and just additional compensation the amount of $85,000.

Decree will be for libelant in the sum of $85,000.