**Victor CAMPBELL, Plaintiff,**

v.

**TIDEWATER ASSOCIATED OIL COMPANY, Defendant.**

United States District Court
S. D. New York.

June 4, 1956.

Kreindler & Kreindler, New York City, for plaintiff. Harry Kreindler, New York City, of counsel.

Tompkins, Boal & Tompkins, New York City, for defendant. Gray Williams, New York City, of counsel.

DAWSON, District Judge.

This is a case for personal injuries tried without a jury by stipulation of counsel. The plaintiff claims that the defendant's ship was unseaworthy and that the defendant was negligent. He also claims maintenance and cure. The Court has jurisdiction by virtue of 28 U.S.C. § 1331.

### Facts

*The accident.* In the early afternoon of May 5, 1952, the plaintiff was descending from the top of a tank or trunk to the deck of the defendant's tanker, the S. S. Veedol, when he fell and suffered the injuries complained of. The tank top, which will hereafter be referred to as the trunk, was approximately 30′ wide and 100′ long. Both the top surface of the trunk and the deck were flat. The top surface of the trunk was 35″ or 36″ higher than the deck. The side of the trunk which, as just stated, measured 35″ or 36″ in height, was straight or perpendicular to the deck. Evenly spaced, some 15′ apart along the 100′ length of the trunk, were about six footsteps or cleats welded to the side of the trunk. These cleats were placed singly and in each instance about halfway up the side of the trunk. Thus each was approximately 18″ below the level of the top surface of the trunk. The cleats were about 1′ in length (the long side being the side welded to the trunk) and 5″ or 6″ wide. It is undisputed that there were no handholds provided for the assistance of those using the cleat in ascending to or descending from the trunk top.

On the day of the accident, the ship was tied to a dock at Revere, Mass. The plaintiff was employed as an able-bodied seaman and had been assigned the 12–4 afternoon shift. While he was working on top of the trunk painting some valves, he was called forward for the regular

coffee break. He could have gone forward either by mounting a flying bridge or catwalk which was elevated from the top of the trunk and ran forward down its length, or by descending to the deck and proceeding along it. He testified that normally, except in rough weather at sea, the flying bridge or catwalk was only for the use of the ship's officers. The plaintiff chose to go by way of the deck and so he went over and put his right foot down lengthwise along the length of one of the cleats and started to lower himself in the manner which was, he said, customary aboard the ship. When he had put all of his weight on the foot on the cleat, it slipped and he pitched over sideways. He landed on his right side and shoulder with his arm twisted underneath and lay there. Shortly after, some people came up and helped him to nearby quarters. An ambulance was summoned, and the plaintiff was taken to the Revere Hospital. He was X-rayed and remained there about an hour. Next he was taken by a company agent to the U. S. Public Health Service Marine Hospital in Boston where he arrived at 4:45 P.M. the same day and remained there about one week.

*Medical care and injuries.* The plaintiff testified that during the time he spent in the Boston Marine Hospital, he felt "terrible" with most of the pain in his right arm, shoulder, and side. More X-rays were taken of his lower arm and a cast was put on his arm from his neck to his finger tips. After about a week, he requested discharge and left for New York where he assumed outpatient status at the Marine Hospital at Stapleton on Staten Island. His arm was kept in a cast for a couple of months and then his arm was soaked in a hot bath once a week. Also, he was given exercises to do and he did them. He continued on this basis, visiting the hospital about once a week, until he was discharged and told, on or about September 12, 1952 that he was fit for work.

The plaintiff's expert medical witness testified that an X-ray taken in September of 1952 shows a fracture of the radius about three-quarters of an inch above the wrist. He testified that due to the restriction in movement, he found the plaintiff had suffered a 25 to 35% permanent partial disability in his right wrist (the plaintiff is right-handed) and a slight permanent partial disability in his shoulder. These findings were concurred in by the doctor called by the defendant, except that this doctor saw no "contra-indication to the resumption of sea duty as an able bodied seaman". In giving this opinion, this doctor conceded that the plaintiff "naturally would be handicapped to some extent".

The plaintiff testified that he still has pain and soreness in his right arm, shoulder, and neck and that his right hand is numb so that he is apt to drop things. The pain is "a lot worse" in rainy spells.

*Maintenance and cure and loss of earnings.* The plaintiff was about 51 years and 7 months old when the accident occurred. He resides in Brooklyn. He stated that his occupation was seaman "off and on since I was a boy". He had been employed by the defendant as an able-bodied seaman since signing on the S. S. Veedol on or about December 1, 1951. The regular rate of compensation was $266.21 a month and in addition lodgings and board on the ship. Due to overtime, his actual earnings were considerably more than the basic rate. Thus, in December of 1951, he received $370.58 from the defendant and in 1951, from January 1 to May 5, he received $1,505.43. This would be an average compensation of about $375 per month exclusive of room and board.

After the accident, the plaintiff received maintenance from the defendant at $42 a week for about eleven weeks until August of 1951. In addition, he was tendered $170 as supplementary maintenance and cure in February of this year (presumably to cover the period from the cutoff in August of 1952 until he was found fit for duty on September 12, 1952). He rejected the offer.

After the plaintiff was discharged from the Marine Hospital on Staten Is-

land, he went to the hiring office of the defendant in quest of work, but he was told none was available for him. He testified that his right arm felt too "weak and sore" for him to do the heavy work required of an able-bodied seaman and so he took a job as a barge captain on a coal barge operating in New York harbor. This employment started on about May 1, 1953 or about one year after the accident. (The doctor called by his counsel testified that in view of the plaintiff's age, occupation, and accident, a period of a year was a reasonable period of recovery.) The plaintiff worked as a barge captain at a compensation of $225 a month, without board being furnished, for two years and nine months until February of this year when he had an argument with the boss and was fired. He has not worked since, but the reason has been the pendency of this lawsuit.

*The issue of unseaworthiness.* Plaintiff's contention is that the injury was caused by the unseaworthiness of the ship. He contends, in the first place, that at the time he put his foot on the cleat, it was "slippery". He did not look at the cleat to see what caused it to be slippery, and did not examine it afterwards, However, he offered the deposition of a fellow crewman named Walker who testified that he was on the morning watch and that the Chief Mate, Day, put some oily liquid on the cleat, possibly an oil called Penetrol, which is a rust inhibitor. Cross-examination brought out that Walker, who had been working on the ship a total of three weeks, had been fired later by Day, which had some bearing on the credence to be attached to this testimony.

On the other hand, the defendant offered the depositions of Day and of two seamen, Selling and Bolen. Day denied that he had done, or ordered done, on the day of the accident any work involving oiling or the applying of anything to the cleats. He testified that there was no oily substance on or near the cleat. Bolen, a seaman, testified that he was sharing with the plaintiff the work of painting the valves on top of the trunk short-ly before the accident. He testified that when he went to make the coffee fifteen minutes before the accident, he used the same cleat that plaintiff had used, and that there was nothing slippery on it. The deposition of the other seaman, Selling, contains no testimony as to the condition of the cleat. The conflict of testimony as to whether there was oil on the cleat at or about the time of the accident makes the Court conclude that plaintiff has not established, by a fair preponderance of the evidence, that there was any oil on the cleat at the time of the accident.

Plaintiff also contends that the physical structure of the ship with these narrow cleats on the side of the trunk on which seamen could ascend or descend, but with no handrails, was proof of unseaworthiness. Witnesses testified that the ship in question was an old ship, and that they had never seen any other ship which had cleats so situated. The fact that the cleats were used for ascending or descending from the trunk was readily admitted. The fact that the cleats had no handrails or handholds was apparent from the exhibits which were put into evidence.

The duty imposed by the warranty of seaworthiness has been variously stated to be a duty that the appurtenance in question on the ship not be "inadequate for the purpose for which it was ordinarily used", Mahnich v. Southern Steamship Co., 1944, 321 U.S. 96, 64 S. Ct. 455, 459, 88 L.Ed. 561, and that the " 'equipment [on the ship] be reasonably fit for the use for which it was intended' ". Manhat v. United States, 2 Cir., 1955, 220 F.2d 143, 148, certiorari denied 1955, 349 U.S. 966, 75 S.Ct. 900, 99 L.Ed. 1288.

Where a seaman is expected to ascend or descend from a structure which is 3′ in height by the use of a narrow cleat attached to the side of the trunk and with no handhold or rail provided by which he can balance himself, the structure is itself not reasonably fit for the use for which it was intended. As the Court said in Schirm v. Dene Steam

Shipping Co., D.C.E.D.N.Y.1914, 222 F. 587:

"If a ladder is set on such a substantial incline that, in order to maintain his equilibrium, the user is compelled to hold himself away from the ladder, then, of course, he must have a handrail, or something else extending above the ladder, to hold on." 222 F. at page 589.

The Court finds as a fact that the structure of the ship which provided cleats for ascending or descending with no handholds or handrails by which the seaman could maintain his equilibrium was an unseaworthy structure and that this unseaworthiness was the proximate cause of the injury to the seaman.

■ *Maintenance and cure.* The plaintiff showed no proof of any expenditures for medical care. The plaintiff was found fit for duty on September 12, 1952. He claims that he did not take any employment until May 1, 1953, or about one year after the accident, because his right arm felt too "weak and sore" for him to do the heavy work required of an able-bodied seaman. Nevertheless, plaintiff was under an obligation to mitigate his damages, and plaintiff has shown no competent proof that in the period between September 12, 1952 and May 1, 1953 he was unable to get some employment which would have mitigated his damages or which would have provided him with funds sufficient for his maintenance. He was a strong able-bodied man about 51 years of age, and the fact that he chose to remain out of work for over seven months after he was certified as fit for duty is no indication that he is entitled to maintenance for this period. The Court finds that plaintiff was entitled to maintenance from May 5, 1952 to September 12, 1952, a period of 130 days. It was stipulated that the rate of maintenance applicable was $6 a day, which would mean that the total maintenance payable to the plaintiff would be $780. It was also stipulated that plaintiff had received $478 maintenance, making a balance due to him for maintenance of $302.

■ *Damages of plaintiff.* Plaintiff's period of unemployment up to the time that he was certified as fit for duty comprised slightly over four months. Figuring an average compensation at about $375 per month, his loss of wages would total approximately $1,600. In addition, as was conceded, he has a permanent partial disability of his right wrist which was variously estimated being from 25% to 35% which, in the opinion of the experts, was not sufficient to prevent him from working as a seaman, but would somewhat impede his activities. Likewise, of course, plaintiff had the pain and suffering which accompanied the injury and a permanent defect in his wrist which, to a certain extent, might diminish his future income.

Taking all of these factors into consideration, the Court finds the damages to which plaintiff is entitled (other than maintenance and cure) in the sum of $7,500. The Court therefore directs that judgment be entered for the plaintiff in the sum of $7,802.

The foregoing opinion shall constitute the findings of fact and conclusions of law of the Court.