Nicholas MANIATIS

v.

THE Steamship ARCHIPELAGO, her engines, boats, etc., in rem, and Penedo Cia. Nav. S.A. of Panama, a foreign corporation or association, as owners, operators and agents of said vessel, in personam.

No. 7804.

United States District Court
E. D. Virginia,
Norfolk Division.

Feb. 27, 1958.

Sidney H. Kelsey, Peter K. Babalas, Norfolk, Va., for libellant.

Seawell, Johnston, McCoy & Winston, John W. Winston, Norfolk, Va., for respondent.

WALTER E. HOFFMAN, District Judge.

Libellant, a citizen of Greece, was employed by respondent in Greece on May 15, 1956, with instructions to proceed to Rotterdam where he signed on the steamship Archipelago on May 19, 1956, at a monthly wage of £34–00–00. The vessel flies the Liberian flag and the respondent owner is domiciled in Panama. Jurisdiction is invoked, in the main, by reason of the fact that libellant was given an advance against unearned wages while in the United States, contrary to the provisions of 46 U.S.C.A. § 599. Respondent admits the illegal advance against unearned wages to the extent of £2–17–00, or approximately $33.42.

On December 8, 1956, while the vessel was at anchorage in quarantine at the Port of Hampton Roads, libellant sustained an injury to the ring finger of his right hand which resulted in an amputation at the distal interphalangeal joint (approximately at the level of the middle phalanx). He was treated at the United States Public Health Service Hospital and discharged on December 24, 1956, as "fit for duty immediately". Two days thereafter he was seen by Dr. John A. Vann, an outstanding orthopedic surgeon, who stated that libellant, in his duties as an able-bodied seaman, should not return to full duty for a period of from three to six weeks from that date, i.e., December 26, 1956. He was later seen by Dr. Gervas S. Taylor, Jr., an associate of Dr. Vann, on January 22, 1957, and his report recommended some form of occupational therapy in the line of manual skill labor for two or three weeks before returning to his maritime duties as a seaman. Libellant left for New York on January 26 and signed aboard another vessel on February 14, 1957. Under this evidence the Court concludes that libellant was not fit for duty on December 24, 1956, and that a reasonable date for such determination would be February 5, 1957.

When libellant was released from the hospital on Christmas Eve, he went to the agent's office where he was given $15 and told to report back on December 26. He returned and was given an opportunity to sign on a ship leaving Norfolk immediately or, in the alternative, he could wait a few days and leave on a vessel out of Baltimore. He declined both offers by indicating that his finger had not sufficiently healed, and the agent concedes that, on the late afternoon of December 26, the agent had been advised with respect to the contents of Dr. Vann's report indicating maximum cure had not been reached. The agent testified that the cost of maintenance in these cases generally averaged $4 to $5 per day, plus the cost of a hotel room at approximately $3.50 per day. Accordingly, the Court fixes maintenance at $8 per day, beginning December 24, 1956, and continuing thereafter to and including February 5, 1957, subject to a credit of $15 previously paid. Bills of Dr. Vann and Dr. Taylor in the aggregate sum of $20 are properly allowable for cure. It cannot be successfully contended that libellant forfeited his right to maintenance by declining the offer of respondent's agent to ship out prior to the time when two reputable orthopedic surgeons have stated would be required for libellant to obtain his proper treatment. If he had left on one of the designated vessels, the obligation of continued maintenance upon arrival in the foreign country would remain and, while it may be argued that no maintenance would be due while on board the vessel, we do not have any estimate of this expense and the difference, if any, would be of little consequence.

A cross-libel filed by respondent, Penedo Cia Naviera S. A., seeking the recovery of $31.33 is properly allowable. While the libellant is entitled to recover from respondent any illegal advances against unearned wages, after allowing a credit for this item there still remains an indebtedness aggregating $31.33 due by libellant to respondent.

Libellant contends that he is entitled to his wages at the rate of £34–00–00 per month during the period of his disability. Under his contract of employment with the vessel, it is provided:

"It is specifically agreed upon that in the case of sickness of the crew member causing, his landing or discharge from the ship for treatment, he shall be entitled to his wages during the period of his incapacity not exceeding four months. In addition he shall receive $\frac{7/6}{9/}$ daily for subsistence allowance but not the above mentioned active service allowance so that the total earning to which he will be entitled in case of sickness will amount to £22–14–00 per month both in respect of wages and subsistence allowance. In case of treatment in a hospital or clinic and while the treatment expenses and subsistence are paid by the shipowning company, or in case the shipowners provided food or paid cost thereof for any reason whatsoever, the crew member shall be entitled only to a compensation amounting to £16–10–00 per month."

■■ The parties have agreed that, as the vessel flies the Liberian flag and libellant signed the employment agreement in Greece (although he signed the articles in Rotterdam), the non-statutory general maritime law of the United States is controlling by virtue of the provisions of the Liberian law. Agreements relating to maintenance and cure are of little value as there is a concomitant obligation of the owner and the vessel to furnish that legal remedy which cannot be abrogated by agreement of the parties. Norris, The Law of Seamen, Vol. 2, § 546. To render binding any agreement with respect to maintenance and cure which may have been executed in a foreign country would destroy the necessity and humanitarian theory upon which maintenance and cure are predicated. However, as to wages during sickness, it would appear that the provisions of the contract govern. It is noted that the contract makes no provision for compensation in substitution for lost wages in the event of an injury. Obviously the reason is that the item of loss of wages is generally included in damages naturally flowing from the resulting injuries. Under the first cause of action herein, libellant shall not be entitled to a decree for wages until the end of the voyage as the evidence is silent as to this latter point, and a recovery is being permitted under the second cause of action on unseaworthiness which will include an allowance for loss of wages.

Turning to the question of unseaworthiness, it is respondent's contention that libellant's injury resulted from the negligence of a fellow crew member and, as the non-statutory general maritime law of the United States is applicable, there can be no recovery in the absence of proof of unseaworthiness. With this abstract statement the Court is in agreement—the difficulty lies in applying the facts of this case to that doctrine. In pointing out the confusion existing between unseaworthiness and negligence, it is said in Gilmore and Black, The Law of Admiralty, p. 320:

"The only case which is today clearly outside the scope of the unseaworthiness doctrine is the almost theoretical construct of an injury whose only cause is an order improvidently given by a concededly competent officer on a ship admitted to be in all respects seaworthy."

Since the decision in Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, wherein it was held that unseaworthiness included "operating negligence", it is indeed difficult to find factual situations presenting pure questions of negligence as distinguished from unseaworthiness. Under the facts of this case it appears that the starboard boom of the No. 2 hatch had been painted during the voyage across the ocean, but this painting was done while the boom rested in a cradle located on the bridge of this Canadian Liberty-type vessel. Upon arrival at quarantine, it became libellant's duty to complete the painting of the boom on the underneath portion of same which had been in the cradle. To accomplish this it became necessary to raise the

boom a short distance in order that libellant could reach that part of the boom not previously painted. The starboard winch at the No. 2 hatch raised the boom a matter of eight to ten inches where it was stopped and, just as libellant was beginning his work, the boom gave way catching libellant's finger in the cradle. In explanation of the cause of the accident it is said that, as the winch operates, a wire passes around a drum (sometimes referred to as a "niggerhead") which is so constructed that the wire will build up on the sides of the drum and then drop or slide to the middle of said drum. A marine surveyor testified that there existed an approximate 25 per cent slope from the outside of the drum end to the middle thereof, and that the drum is constructed in that manner to enable the wire to slide readily toward the center of same. As the line comes off the drum it is held by a fellow crew member in a tight manner to prevent the wire from slipping on the drum, but the holder of this line may permit sufficient slack to enable the wire to slide to the center of the drum.

In this case the crew member holding the wire insists that it was held properly and tightly, but the wire slipped on the drum nevertheless. The marine surveyor concedes that the wire on the drum would not slip if properly held, unless the drum had been recently painted or rust was present on the wire or drum which could cause a slipping. In short, if properly operated and properly maintained, the wire would not slip on the drum and the accident would not have occurred. This is either "unseaworthiness" as known prior to Mahnich, or "operating negligence" equivalent to "unseaworthiness" as stated in Mahnich, or both.

For the pain, suffering, loss of wages and permanent injury sustained by libellant, the Court will allow the sum of $3,500. Proctors for libellant will prepare a decree in accordance with this opinion, which is adopted by the Court in lieu of specific findings of fact and conclusions of law, in accordance with the provisions of General Admiralty Rule 46½, 28 U.S.C.A., and, after presentation to proctors for respondents for inspection and endorsement, forward same to the Court for entry.