Edward S. **MESLE**

v.

**KEA STEAMSHIP CORPORATION,** Appellant (**Haenn Ship Ceiling & Refitting Corporation**).

No. 12540.

United States Court of Appeals
Third Circuit.

Argued June 5, 1958.

Decided Sept. 30, 1958.

Rehearing Denied Nov. 18, 1958.

**748**

Thomas F. Mount, Philadelphia, Pa. (Rawle & Henderson, Philadelphia, Pa., Harrison G. Kildare, Philadelphia, Pa., on the brief), for appellant.

Milton Borowsky, Philadelphia, Pa. (Abraham E. Freedman, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for appellee Mesle.

T. E. Byrne, Jr., Philadelphia, Pa. (Krusen, Evans & Shaw, Philadelphia, Pa., Bernard J. McNulty, Jr., Philadelphia, Pa., on the brief), for appellee Haenn Ship Ceiling & Refitting Corp.

Before MARIS, GOODRICH and Mc-LAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is an appeal on an *in personam* libel in admiralty brought against the owner of the ship in which occurred the accident whereby the hurts suffered by libellant resulted. The libel alleged negligence on the part of the shipowner and unseaworthiness of the vessel. The shipowner impleaded libellant's employer.

The Haenn Ship Ceiling and Refitting Corporation had been engaged by the respondent shipowner to effect certain carpentry repairs to the fittings in the S.S. Sunion's No. 5 hold while the vessel was at Philadelphia. In the early afternoon of March 4, 1953, Edward S. Mesle, an employee of Haenn, and a number of his co-workers descended into the lower hold which was outfitted for the bulk carriage of grain. Necessary for assuring the underway stability of the ship so engaged is the erection along the hold's center line of a device known as a shifting board. The function of the shifting board is to reduce the free surface effect resulting from the lateral flow of the grain following each roll of the ship.

The shifting board had been constructed by erecting three double sets of uprights, consisting of 2″ by 10″ or 2″ by 12″ planks spaced approximately eight feet apart, between which 2″ by 10″ boards were nailed horizontally so as to form a bulkhead. This bulkhead was braced athwartships by nine shores on the port side and nine shores on the starboard side. Each of the three sets of uprights thus was braced by three shores on each side. The shores were 4″ by 6″ timbers. The top one in each tier of three extended down from the 'tween deck hatch coaming to an upright of the

shifting board. Approximately 7' below this one the middle shore of the tier extended from the upright downward at an angle to where the outboard end butted against a sweat batten at the inboard face of a frame of the ship. About 7' below this middle shore the lower shore paralleled it from the upright to the same frame. Frames are 30" apart and are about 18" in depth; to their outboard faces the plates forming the skin of the vessel are attached.

The shores were secured in place by trimming the ends so as to butt one against the shifting board upright and the other against the batten at the frame. The ends were secured in place by being snugly framed with wooden cleats made of 2" by 3" pieces of wood several feet in length. On the inboard end the cleats were nailed to the shifting board. On the outboard end they were nailed to sweat battens. These sweat battens were 2" by 6" lengths of dressed lumber running horizontally, fore and aft, up the sides of the hold, about eight to ten inches apart, and held in place by L-shaped metal clips welded to the faces of the frames. The clips were open at the top to permit removal and insertion of the sweat battens. Sweat battens are for the prevention of contact with the plates by packaged cargo of a nature to be harmed by the water which condenses on the plates under certain conditions.

Mesle and his fellow workers were assigned to take out and replace the two middle shores in the port and starboard tiers bracing the after upright of the shifting board, both of the shores having become cracked at roughly the middle.

The men first went to work on the starboard side to remove the damaged shore located there. A line was thrown around the shore and a double turn taken around its middle. Both ends of the line were carried back to a recess in the after part of the hold above the shaft alley from where the men tugged at the line until the shore broke where it had been cracked. When this happened, the outboard end of the shore fell free to the bottom of the hold; the inboard end hung down from the nails which had toe-nailed it to the shifting board, its weight being insufficient to pull it free.

The men then repaired to the port side where they similarly attempted to break and pull down the damaged shore there. When it did not give, the men dropped the line, the foreman saying, "It looks like we're going to have to knock off a cleat there, Ed, get up there and knock one off."

Whereupon libellant climbed up the sweat battens at a point just forward of the shore until he was standing on the batten to which the end of the shore was fastened, some twelve feet above the floor of the hold. Turning about so that his heels were hooked on the batten and holding onto a higher batten with his left hand, he wielded a hatchet with his right to split away the cleat along the afterside of the shore. No sooner had the last of the cleat fallen away than the end of the shore unexpectedly slipped off the batten at the point the batten was in contact with the face of the frame, moving down, aft, and enough outboard so as to come between the frames vertically and the battens horizontally. This movement was enough to pull the other end of the shore loose from the shifting board so that it fell to the floor of the hold. The outboard end thus see-sawed upward, levering the batten above out of its clip thereby catapulting Mesle into the air from whence he landed heavily, severely injuring himself.

Inspection of the shore revealed that its ends had not been toe-nailed as was the usual custom. Had it been, the nails would doubtless have held the shore in place until some force was exerted to pull it down. The absence of the toe-nails could not have been discovered so long as the cleats were in place around the ends of the shore. The questions presented to the trial court were whether the ship's personnel, and through them the shipowners, had been negligent in permitting erection of the shore without toe-nailing and whether the shore so erected was unseaworthy.

The trial judge adopted the libellant's proposed findings of fact and conclusions of law, a practice which this court had disapproved on another occasion[1] as being an inadeqate compliance with Admiralty Rule 46½, 28 U.S.C.A. We have in mind the edict in McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 that a judgment in admiralty is not to be set aside unless it is clearly erroneous. And yet where the court has not independently set out its findings we think the reviewing court may more readily be " * * * 'left with a definite and firm conviction that a mistake has been committed.' "[2] The Severance, 4 Cir., 1945, 152 F.2d 916.

A duty owed by the shipowner to one in Mesle's position was the exercise of reasonable care in maintaining the premises in a condition safe for business invitees with due regard for the purposes calling for the presence of such invitees. In short the duty was the specific one of providing a reasonably safe place in which to work. The duty is not an absolute one, however. Lake v. Standard Fruit & Steamship Co., 2 Cir., 1950, 185 F.2d 354. Here, the duty would have been met had Mesle or his employer's representative been informed of the absence of toe-nails in the particular shore or had the alleged defect been repaired. But to require repair or warning would initially have required notice imputable to the shipowner. There is no evidence that respondent or its servants had actual notice of the fact that the shore was not toe-nailed nor do we think that respondent can fairly be imposed with constructive notice thereof. The absence of toe-nails was not apparent, as has already been noted, once the cleats were in position. Thus even if the completed structure had been inspected by ship's personnel as is indeed the custom, the alleged defect would not have been visible upon such inspection. The adequacy of the cleating and the snugness of the shores would have been the subject of such inspection; these are enough for assurance that the shores will perform their function.[3] Under these circumstances to hold that the ship was negligent in not acquiring notice of the lack of toe-nails would in effect require supervision by the ship's personnel over the placing of every nail. This is obviously an impractical and unreasonable burden. We conclude that the trial court erred in finding any negligence on the part of respondent.

Having reached this point it is apparent that the judgment, if it is to be affirmed, must rest on the finding of existence of an unseaworthy condition. It suffices simply to note preliminarily that the shipowner's duty, originally owed only to seamen, of maintaining a vessel seaworthy in hull and appurtenances extends to shore-side workers furnishing to the vessels services which in a time of less specialized economic activity were usually rendered by the crew. Pope & Talbot v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. There is no question that the benefit of the shipowner's obligation runs to libellant.

"Seaworthiness" is another of those terms in the law which by reason of its appearance in different contexts has developed an elusiveness making impossible an omnisufficient definition. But in order to articulate our standard of judgment we must presume to attempt a definition of the term sufficient at least for the purposes of this case.

It is quite apparent that whether or not an appurtenance is "in fit condition * * * for a voyage and the incident perils of the sea"[4] is usually an irrelevancy. It is said that "(t)he concept

1. The Plow City, 3 Cir., 1941, 122 F.2d 816.

2. McAllister v. United States, supra, 348 U.S. at page 20, 75 S.Ct. at page 8, quoting United States v. Oregon State Medical Society, 1952, 343 U.S. 326, 339, 72 S.Ct. 690, 96 L.Ed. 978.

3. The evidence shows that Coast Guard regulations require cleating, but do not mention toe-nailing.

4. From a dictionary definition of "seaworthy".

of seaworthiness contemplates no more than that a ship's gear shall be reasonably fit for its intended purpose." [5] Yet examination of a great many personal injury cases in which claims of unseaworthiness were presented leads to the conclusion that those cases are of two categories, both of which fit this general definition. One is where the shipowner, having knowledge—actual or constructive—that certain activity will occur, is imposed with an absolute duty of supplying equipment for permitting the conduct and accomplishment in reasonable safety of that activity; liability is imposed for failure to comply with this duty, termed one of making the vessel seaworthy.[6] The other category is where the equipment actually supplied by the owner for doing the ship's work proves incapable of performing its function in the manner for which it was designed.[7]

5. Crumady v. The Joachim Hendrik Fisser, 3 Cir., 1957, 249 F.2d 818, 821.

6. Some cases fitting this category in which recovery was permitted on the ground that unseaworthiness had been proved are Carlisle Packing Co. v. Sandanger, 1922, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927; Halecki v. United New York and New Jersey Sandy Hook Pilot's Ass'n, 2 Cir., 1958, 251 F.2d 708; Buch v. United States, 2 Cir., 1955, 220 F.2d 165; Bentley v. Albatross S.S. Co., 3 Cir., 1953, 203 F.2d 270; Hawn v. Pope & Talbot, 3 Cir., 1952, 198 F.2d 800 (where the facts appear more fully than in Pope & Talbot v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Krey v. United States, 2 Cir., 1941, 123 F.2d 1008; The Seeandbee, 6 Cir., 1939, 102 F.2d 577; Christopher v. Grueby, 1 Cir., 1930, 40 F.2d 8; Pinion v. Mississippi Shipping Co., D.C.E.D.La.1957, 156 F. Supp. 652; Campbell v. Tidewater Associated Oil Co., D.C.S.D.N.Y.1956, 141 F. Supp. 431; Ladjimi v. Pacific Far East Line, D.C.N.D.Cal.1951, 97 F.Supp. 174; The Leontios Teryazos, D.C.E.D.N.Y. 1942, 45 F.Supp. 618; The Edith Godden, D.C.S.D.N.Y.1885, 23 F. 43.

   Cases in this category which denied recovery because unseaworthiness was not shown are The Baymead, 9 Cir., 1937, 88 F.2d 144; Newport News Shipbuilding & Drydock Co. v. Watson, 4 Cir., 1927, 19 F.2d 832 (recovery permitted on proof of negligence, however); Hanrahan v. Pacific Transport Co., 2 Cir., 1919, 262 F. 951; The New York, 2 Cir., 1913, 204 F. 764; Smith v. United States, D.C.Md.1946, 66 F.Supp. 933; The Ubbergen, D.C.E.D.N.Y.1925, 30 F.2d 951 (recovery permitted on proof of unseaworthiness of second category, however).

7. Some cases in this category which granted recovery are Alaska S.S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Crawford v. Pope & Talbot, Inc., 3 Cir., 1953, 206 F.2d 784; The Fletero v. Arias, 4 Cir., 1953, 206 F.2d 267; Kulukundis v. Strand, 9 Cir., 1953, 202 F.2d 708; Read v. United States, 3 Cir., 1953, 201 F.2d 758; The Diamond Cement, 9 Cir., 1938, 95 F.2d 738; The H. A. Scandrett, 2 Cir., 1937, 87 F.2d 708; Ives v. United States, 2 Cir., 1932, 58 F.2d 201; Henry Gillen's Sons Lighterage v. Fernald, 2 Cir., 1923, 294 F. 520; The Colusa, 9 Cir., 1918, 248 F. 21; Thompson Towing & Wrecking Ass'n v. McGregor, 6 Cir., 1913, 207 F. 209; The Fullerton, 9 Cir., 1908, 167 F. 1; Lafourche Packet Co. v. Henderson, 5 Cir., 1899, 94 F. 871; Maniatis v. The Archipelago, D.C.E.D.Va.1958, 159 F.Supp. 245; Green v. Orion Shipping & Trading Co., D.C.Md.1956, 139 F.Supp. 431; Cowan v. Inland Waterways Corp., D.C. E.D.Ill.1954, 121 F.Supp. 683; Capadona v. The Lake Atlin, D.C.S.D.Cal.1951, 101 F.Supp. 851; Stokes v. United States, D.C.S.D.N.Y.1944, 55 F.Supp. 56; The Harry Howard, D.C.Mass.1941, 41 F. Supp. 19; Adders v. United States, D.C. E.D.N.Y.1933, 5 F.Supp. 457; The Ubbergen, D.C.E.D.N.Y.1929, 30 F.2d 951; The Navarino, D.C.E.D.N.Y.1925, 7 F.2d 743; Hoof v. Pacific American Fisheries, D.C.W.D.Wash.1922, 284 F. 174; The Drumelton, D.C.S.D.N.Y.1907, 158 F. 454; Erquit v. New York & Cuba Mail S.S. Co., D.C.E.D.N.Y.1892, 50 F. 325.

   Some cases in this category which denied recovery are Crumady v. The Joachim Hendrik Fisser, 3 Cir., 1957, 249 F. 2d 818; Shannon v. Union Barge Line Corp., 3 Cir., 1952, 194 F.2d 584; The Daisy, 9 Cir., 1922, 282 F. 261; Ludvigsen v. Commercial Stevedoring Co., D.C. E.D.N.Y.1955, 131 F.Supp. 337.

   Some more cases in which recovery was denied but which additionally indicate that the defect rendering an appurtenance unseaworthy must be latent or inherent in the appurtenance itself are Cookingham v. United States, 3 Cir.,

The present case appears pretty clearly not to be one of the second category. The shore was capable of performing and did perform its function of supporting the shifting board under the stresses set up in a hold full of grain during a voyage. The absence of toe-nailing did not render the shore any less fit for this function so long as the cleats stayed in place. The crack in the shore undoubtedly reduced its capability, but if that were to be relied upon for establishing unseaworthiness of the shore, libellant's engagement in correcting the very defect would make it obvious that the shore was not warranted as seaworthy in that respect. Bruszewski v. Isthmian S.S. Co., 3 Cir., 1947, 163 F.2d 720. The case must, therefore, be one of the first category.

The question in its final analysis thus is reduced to whether the shipowner had the absolute duty—meaning that he would be imposed with liability regardless of negligence for any harm resulting from breach thereof—to supply toe-nailing in the shore.[8] Cumulative and uncontradicted testimony was that shores were invariably erected in a manner which required insertion of nails before the required cleats were positioned. Although, as has been noted, cleating alone is sufficient under the applicable Coast Guard regulations, those regulations are concerned only with the adequacy of the structure for preventing excess movement of the cargo at sea. They do not purport to be concerned with the safety of personnel engaged in erecting or tearing down the structure. But the ship-owner must be so concerned; it knows the structure will be taken down. In light of the custom of toe-nailing shores it is anticipatable that the custom may be relied upon somehow in the dismantling process for an assumption that a shore will remain in place after its cleats have been removed. The shore which was not toe-nailed, then, was not reasonably safe for dismantling by one of the customary methods, which in fact was used here; it was therefore unseaworthy.

The cases which we feel compel the result (cited in footnote 6) might alternatively have rested on findings of negligence. The point is, however, that they did not. Thus the concept of unseaworthiness which we have attempted to articulate by distillation from those cases and have applied here has evolved to support a recovery amounting to the imposition of absolute liability, chiefly by reliance on cases supporting the closely allied concept which we have here referred to as the second category of unseaworthiness. Those cases had already reached the point of imposing absolute liability for unseaworthiness.

It has already been intimated that since libellant was not engaged in remedying the very defect which caused his injury, the warranty of seaworthiness of the structure in respects other than that calling for repair continued to run to him. Bruszewski v. Isthmian S.S. Co., supra, consequently does not control this case. See Gindville v. American-Hawaiian S.S. Co., 3 Cir., 1955, 224 F. 2d 746.

---

1950, 184 F.2d 213; Borgersen v. Skibs A/S Abu, D.C.E.D.N.Y.1957, 156 F. Supp. 282; Garrison v. United States, D.C.N.D.Cal.1954, 121 F.Supp. 617; Daniels v. Pacific-Atlantic S.S. Co., D.C. E.D.N.Y.1954, 120 F.Supp. 96; Adamowski v. Gulf Oil Corp., D.C.E.D.Pa. 1950, 93 F.Supp. 115. But cf. Oakes v. Graham Towing Co., D.C.E.D.Pa.1955, 135 F.Supp. 485, where probably recovery should have depended on proof of negligence.

Cases which denied recovery by treating the question of unseaworthiness purely as one of negligence are The Tawmie, 5 Cir., 1936, 80 F.2d 792; The Cricket, 9 Cir., 1934, 71 F.2d 61; The Birkenhead, D.C.E.D.Pa.1930, 51 F.2d 116; Burton v. Greig, D.C.S.D.Ala.1920, 265 F. 418; The Henry B. Fiske, D.C.Mass. 1905, 141 F. 188.

8. Even the imposition of absolute liability depends upon the injured person's being one whom " * * * the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity * * *." Restatement, Torts, § 519.

Respondent also appealed from the dismissal of its claim over against the libellant's employer whom it had impleaded. The only possibility by which indemnity might be had in the circumstances under which libellant's judgment is affirmed would require Haenn to have been the contractor who originally erected the shifting board and the shoring. See Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. There is no evidence as to the existence of such a relationship.

The judgment in favor of libellant and the impleaded respondent will be affirmed.

### On Petition for Rehearing

### PER CURIAM.

Recovery was here affirmed on the ground of unseaworthiness. Since there was no evidence of impleaded respondent's responsibility for the particular condition, the third party complaint against it was necessarily dismissed.

The opinion did not discuss the question of whether the shipowner had failed to provide a safe place to work in permitting the stevedore to employ the method it used for removing the shore. The lack of discussion was because the sole ground urged for such method having been foreseeably unsafe was that the shore might not have been toe-nailed. In that view, the proximate cause would still have been the existence of the unseaworthy condition. Since we considered it unreasonable to charge the shipowner with notice of that defect,[1] it is implicit in the opinion that it would have been even more unreasonable to so charge the stevedore.

The petition for rehearing will be denied.

[1]. See Filipek v. Moore-McCormack Lines, 2 Cir., 1958, 258 F.2d 734, 737 reported since the opinion in this case was filed.